In the Matter of Antavis Chavis, Misc. No. 65, September Term, 2022

**AMERICANS WITH DISABILITIES ACT – UNIFORM BAR EXAMINATION – TEST ACCOMMODATION REQUEST –** Supreme Court of Maryland held that bar applicant met burden to prove both that he has "disability" under Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 to 12213, and that test accommodation he requested—*i.e.*, 50% additional time to take Uniform Bar Examination ("UBE")—was warranted. Supreme Court adopted two-step test for determining whether bar examination test accommodation request should be granted. First step is to determine whether applicant meets definition of word "disability" under ADA—*i.e.*, whether applicant has "physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. § 12102(1)(A). Second step is to determine whether test accommodation requested by applicant would be "reasonable, consistent with [] nature and purpose of [] examination and necessitated by [] applicant's disability." Bd. R. 3(a).

Supreme Court observed that, under ADA and related federal regulations, definition of disability should be broadly construed, and evidence of past test accommodations must be given considerable weight. Supreme Court determined that requirement that request be consistent with nature and purpose of UBE and necessitated by disability does not impose additional burden of proof exceeding reasonableness requirement of ADA, but rather is part of reasonableness analysis.

Supreme Court concluded that, in light of "ADHD Verification Form" completed by medical doctor who found that applicant met criteria in DSM-IV for "ADHD[,] inattentive type" and recommended that applicant be provided additional time and other test accommodations as to law school exams, applicant met burden to prove that he had disability under ADA and that requested test accommodation was reasonable, necessary, and consistent with nature and purpose of UBE. Court sustained applicant's exceptions to recommendation of panel of Accommodations Review Committee to uphold denial by State Board of Law Examiners ("SBLE") of applicant's test accommodation request, reversed denial, and remanded matter to SBLE with instruction to grant applicant's test accommodation request.

IN THE SUPREME COURT

OF MARYLAND

Misc. No. 65

September Term, 2022
_____

IN THE MATTER OF ANTAVIS CHAVIS
_____

Fader, C.J.
Watts
Hotten
Booth
Biran
Gould
Eaves,

JJ.

_____

Opinion by Watts, J.
Fader, C.J., Booth and Gould, JJ., dissent.

_____

Filed:   December 21, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

Before us are the exceptions under Maryland Rule 19-208(c) of Antavis Chavis,[1] an applicant to the Bar of Maryland, to the recommendation of a panel of the Accommodations Review Committee ("the ARC") to uphold the decision of the State Board of Law Examiners ("SBLE") denying Mr. Chavis's request for a test accommodation in the form of 50% additional time to take the Uniform Bar Examination ("the UBE"). Mr. Chavis made the test accommodation request under the Americans with Disabilities Act of 1990 ("the ADA"), 42 U.S.C. §§ 12101 to 12213, and, in doing so, disclosed that he has attention deficit hyperactivity disorder ("ADHD"). Together with his test accommodation request, Mr. Chavis provided an "ADHD Verification Form" completed by a medical doctor who diagnosed him with ADHD and recommended that he be provided additional time to take law school exams. Mr. Chavis also provided documentation showing that both of the two law schools that he attended had provided him with 50% additional time to take exams.

Although for slightly different reasons than those set forth in his exceptions, we conclude that Mr. Chavis has met the burden to prove that he is an individual with a condition that meets the definition of "disability" under the ADA and that the test accommodation that he requested would be "reasonable, consistent with the nature and purpose of the examination and necessitated by [his] disability." Bd. R. 3(a). Accordingly, we sustain Mr. Chavis's exceptions, reverse SBLE's decision, and remand the matter to SBLE with instruction to grant Mr. Chavis's test accommodation request.

---

[1]Originally, the caption of this case was In the Matter of A.C. In a letter to the Clerk of this Court dated September 22, 2023, Mr. Chavis's counsel advised that Mr. Chavis consented to the use of his name, including in the caption of this case.

## BACKGROUND

**Mr. Chavis's Test Accommodation Request and Supporting Documentation**

From Fall 2019 through Fall 2022, Mr. Chavis took classes at Southern University Law Center, from which he ultimately graduated. In Spring 2023, as a visiting student, Mr. Chavis took classes at the University of the District of Columbia David A. Clarke School of Law. In an SBLE form titled "Applicant's Request for A.D.A. Test Accommodations for the UBE in Maryland" completed on March 27, 2023, Mr. Chavis requested additional time to take the UBE, "preferably 50% [a]dditional time[.]" In the form, Mr. Chavis disclosed that he has ADHD and "[i]ssues with focus" and that he requires "a significant amount of time to complete tasks[.]"

In support of his test accommodation request, Mr. Chavis attached an ADHD Verification Form produced by Southern University Law Center. On August 26, 2022, Jeffrey Thiebaud, M.D., completed the ADHD Verification Form, finding that Mr. Chavis met the "full [] criteria" set forth in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") for "ADHD[,] inattentive type"[2]—*i.e.*, Dr.

---

[2]Under the DSM-IV, the criteria for a diagnosis of ADHD, Predominantly Inattentive Type, include

> [s]ix (or more) of the following symptoms of inattention have persisted for at least 6 months to a degree that is maladaptive and inconsistent with developmental level: . . . a. often fails to give close attention to details or makes careless mistakes in schoolwork, work, or other activities[;] b. often has difficulty sustaining attention in tasks or play activity[;] c. often does not seem to listen when spoken to directly[;] d. often does not follow through on instructions and fails to finish schoolwork, chores or duties in the workplace (not due to oppositional behavior or failure to understand instructions)[;] e.

Thiebaud diagnosed Mr. Chavis with ADHD. In response to a question asking: "What evidence has been reviewed to indicate that ADHD symptoms cause the applicant difficulty taking tests?", Dr. Thiebaud wrote: "Personal experience and neuropsychiatric testing[.]" Dr. Thiebaud indicated that Mr. Chavis's self-reported symptoms of ADHD included "poor attention and focus[,]" taking "longer to complete tasks[,]" and often not completing "tasks due to distraction[,]" and that he was first diagnosed with ADHD at age 8. Dr. Thiebaud stated that Mr. Chavis's symptoms of ADHD were not limited to academic environments, and that he had difficulty completing tasks, and often left them undone, at work and at home. Dr. Thiebaud also noted that Mr. Chavis had taken Adderall, which is a prescription medication used to treat ADHD. See Rochkind v. Stevenson, 454 Md. 277, 282, 164 A.3d 254, 256 (2017).

Dr. Thiebaud recommended that Mr. Chavis be given "additional time to complete

---

often has difficulty organizing tasks and activities[;] f. often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort (such as schoolwork or homework)[;] g. often loses things necessary for tasks or activities (e.g., toys, school assignments, pencils, books or tools)[;] h. is often easily distracted by extraneous stimuli[; and] i. is often forgetful in daily activities[.]

Substance Abuse and Mental Health Services Administration, Center for Behavioral Health Statistics and Quality, DSM-5 Changes: Implications for Child Serious Emotional Disturbance (June 2016) at 17-18, available at https://www.ncbi.nlm.nih.gov/books/ NBK519708/pdf/Bookshelf_NBK519708.pdf [https://perma.cc/SU6M-FX5L] (paragraph breaks omitted). Another requirement is that it is not the case that at least six identified symptoms of hyperactivity-impulsivity have persisted for at least six months to a degree that is maladaptive and inconsistent with developmental level. See id. at 19. The DSM-5 identifies the same symptoms of inattention for diagnosis of ADHD, predominantly inattentive type, in adults. See Children and Adults with Attention-Deficit/Hyperactivity Disorder, Diagnosis of ADHD in Adults (2023), available at https://chadd.org/for-adults/ diagnosis-of-adhd-in-adults/ [https://perma.cc/VW7Z-CEZE].

- 3 -

exams and [an] isolated testing environment to limit distractions[,] if possible." Dr. Thiebaud stated that Mr. Chavis would "be adversely affected if not given additional time." Dr. Thiebaud explained that ADHD, inattentive type, "typically responds well to accommodations."

In addition to the ADHD Verification Form that Dr. Thiebaud completed, Mr. Chavis attached to his test accommodation request a memorandum dated September 6, 2022 from Dorothy Straughter-Parker, the Health, Wellness, and Disability Director of Southern University Law Center. In the memorandum, consistent with Dr. Thiebaud's recommendation, Ms. Straughter-Parker advised Mr. Chavis that her office would grant his request for test accommodations, and that he would be given 50% additional time to take exams and quizzes and the ability to take them in a low-distraction testing room. Ms. Straughter-Parker indicated that these accommodations were required by 29 U.S.C. § 794, which Congress enacted through Section 504 of the Rehabilitation Act of 1973.[3]

Mr. Chavis also attached to his test accommodation request a memorandum dated January 25, 2023 from Pamela Butler, a Certified Rehabilitation Counselor of the Accessibility Resource Center at the University of the District of Columbia David A. Clarke School of Law. In the memorandum, consistent with Dr. Thiebaud's recommendation, Ms. Butler advised that Mr. Chavis was to be provided the following

---

[3]"Section 504 of the Rehabilitation Act prohibits state and local programs receiving federal financial assistance -- including public schools -- from discriminating against a 'qualified individual with a disability . . . solely by reason of her or his disability.'" Baker v. Bentonville Sch. Dist., 75 F.4th 810, 815 (8th Cir. 2023) (quoting 29 U.S.C. § 794(a)) (ellipsis in original). "[T]he enforcement, remedies, and rights are the same under both" Title II of the ADA and Section 504 of the Rehabilitation Act. Id. (cleaned up).

- 4 -

accommodations: 50% additional time to take exams and quizzes, the ability to take them in a reduced-distraction room, the ability to take five- to ten-minute breaks during classes and tests, and the use of two pieces of assistive technology, including one designed to assist with notetaking. Ms. Butler indicated that these accommodations were required by the ADA and Section 504 of the Rehabilitation Act of 1973.

### Dr. Lewandowski's Opinions and SBLE's Decision

On April 11, 2023, SBLE received Mr. Chavis's test accommodation request form. Under Board Rule 3(c)(2), SBLE referred Mr. Chavis's test accommodation request to Lawrence Lewandowski, Ph.D., a licensed psychologist. Board Rule 3(c)(2) states that, where "there is uncertainty about whether the requested test accommodation is warranted pursuant to the ADA, the applicant's request and all supporting documentation may be referred to a qualified expert retained by [SBLE] to review and analyze whether the applicant has documented a disability and requested a reasonable accommodation."

In a letter to SBLE's Director of Character and Fitness dated May 24, 2023, Dr. Lewandowski opined that Mr. Chavis did "not qualify for test accommodations." Without providing a citation, Dr. Lewandowski stated that, for an applicant to qualify for a test accommodation, the circumstances must satisfy two criteria: (1) the applicant has "an evidence-based diagnosis of a mental or physical disorder from a qualified professional"; and (2) "the disorder substantially limits them in a major life activity as compared to most people." Addressing the first criterion, Dr. Lewandowski stated that, although the documentation provided by Mr. Chavis contained "some support for the ADHD diagnosis," there was "no objective data to prove the validity of the diagnosis[,]" and he could not

"confirm the diagnosis based on the little information in th[e] file." Dr. Lewandowski stated that, "[m]ore importantly, the second criterion [wa]s not addressed by the current documentation" and that there was "no demonstration of impairment in attention, processing speed, reading, writing, or any other function required on the" UBE.

In a letter to Mr. Chavis dated May 31, 2023, SBLE's Director of Character and Fitness[4] advised that SBLE had denied his test accommodation request. SBLE quoted some of Dr. Lewandowski's opinions about Mr. Chavis's request, and advised that Mr. Chavis did not qualify for a test accommodation "[i]n the absence of objective data to prove the ADHD diagnosis and establish impairment in a major life activity as compared to most people[.]"

**Mr. Chavis's Appeal to the ARC and Proceedings in This Court**

In a document received by SBLE on June 12, 2023, under Maryland Rule 19-208(b)(1), Mr. Chavis noted an appeal to the ARC. Maryland Rule 19-208(a)(1) provides that the ARC is a committee that consists of nine members appointed by this Court.[5] On July 12, 2023, a panel of the ARC[6] conducted a hearing. Mr. Chavis, who represented himself at the time, and Dr. Lewandowski testified at the hearing.

_____

[4]Going forward, we refer to statements by SBLE's Director of Character and Fitness as statements of SBLE.

[5]Maryland Rule 19-208(a)(1) states:

Six members shall be attorneys admitted to practice in Maryland who are not members of [SBLE]. Three members shall be non-attorneys. Each non-attorney member shall be a licensed psychologist or physician who, during the member's term, does not serve [SBLE] as a consultant or in any capacity other than as a member of the Committee.

[6]For brevity, below, we refer to actions of the panel as actions of the ARC.

Mr. Chavis's testimony indicated that his path to law school was not an easy one. Mr. Chavis testified that, from a young age, he has struggled with focus, attention to detail, and day-to-day tasks. For instance, Mr. Chavis testified that it always took him "a longer time to complete tests" than other students. Mr. Chavis explained that when he was growing up, these issues were seen as "a behavioral problem and not a learning disability." Mr. Chavis testified, by way of illustration, that his mother used to say: "[T]here's nothin[g] wrong with him. He just needs to work on it. He just needs to be disciplined and he'll be fine." Mr. Chavis observed that this was "not true."

Mr. Chavis testified that he did not request test accommodations in high school or college because he "didn't want anyone to think there was anything wrong with" him. Mr. Chavis explained that leaving a classroom to take a test would have been "embarrassing" when he was a child. And, doing so would have been "humiliating" when he was in college.

Mr. Chavis testified that before his last year of law school, however, he spoke to counselors and finally realized that he "needed to address the problem, and that there was no need to be embarrassed." As a result, according to Mr. Chavis, he "did everything [he] could do to ensure that [he] got the help that [he] needed." Mr. Chavis testified that his test accommodations in law school "leveled the playing field in terms of allowing [him] just to have the same opportunity as other people would have who don't need accommodations."

As a witness for SBLE, Dr. Lewandowski testified that he has reviewed accommodation requests for multiple jurisdictions, medical boards, and business boards

since approximately 1994, and that he reviews between 100 and 200 test accommodation requests every year. Consistent with his report to SBLE, Dr. Lewandowski testified that, for an individual to qualify for a test accommodation, there must be a diagnosis that "ideally" is "not based on the self-report of the person himself[,]" and there must be "a demonstration of functional impairment" that, in "the case of a bar exam, [] would restrict the access to the exam." Addressing the first criterion, Dr. Lewandowski testified that, although Dr. Thiebaud determined that Mr. Chavis has ADHD, that determination was "based on . . . Mr. Chavis'[s] report[,]" and there was "no objective evidence of ADHD[,]" such as the results of the neuropsychiatric testing that Dr. Thiebaud administered. According to Dr. Lewandowski, unlike Mr. Chavis, most individuals with ADHD "have childhood evidence" and have "been tested" in various areas, such as processing speed. Addressing the second criterion, Dr. Lewandowski testified that there was no evidence that Mr. Chavis "has impaired attention, and that it affects his ability to complete a task[.]"

On the same day as the hearing, the ARC issued a Hearing Report in which it recommended upholding SBLE's denial of Mr. Chavis's test accommodation request. Relying on the first criterion that Dr. Lewandowski identified—*i.e.*, that the applicant must "have an evidence-based diagnosis of a mental or physical disorder from a qualified professional"—the ARC determined that "there was no showing by [Mr. Chavis] of any diagnostic or any data-based evidence related to [his] assertion of ADHD." Addressing the second criterion that Dr. Lewandowski identified—*i.e.*, that "the disorder substantially limits [the applicant] in a major life activity as compared to most people"—the ARC indicated that "no objective evidence or testimony was presented by [Mr. Chavis] related

- 8 -

to a showing of substantial limitation in any major life activity, nor how there were limitations regarding functions required on the" UBE. In other words, according to the ARC, Mr. Chavis "did not show any evidence that he has a disability that substantially limits him in sitting for the [UBE], nor did [he] provide objective evidence of any functional limitations." (Footnote omitted).

The ARC reasoned that, "[e]ven presuming that [Mr. Chavis] meets the legal definition of disability, which could be the case, he does not seem to have met the second criterion[,]" under which he needed to establish a "nexus between the alleged disability and the reasonable accommodations he may or may not have received." The ARC explained that "[t]he basis of this decision was the weight of the expert evidence from Dr. Lewandowski and his assessment that there was insufficient evidence to show an impairment that warranted accommodation under the [ADA]." According to the ARC, "Dr. Lewandowski's testimony and a thorough review of the records/evidence submitted by [Mr. Chavis] clearly set forth that there was insufficient evidence to show [his] impairment substantially limited him in sitting for the [UBE]."

On August 9, 2023, under Maryland Rule 19-208(c), Mr. Chavis filed exceptions to the ARC's recommendation. On September 5, 2023, under Maryland Rule 19-208(d), we issued an order directing Mr. Chavis, at a hearing on October 2, 2023, to "show cause why the exceptions should not be denied." Maryland Rule 19-208(d) provides that proceedings in this Court "shall be on the record made before the panel" of the ARC and that "[t]he Court shall require the party who filed exceptions to show cause why the exceptions should

not be denied."[7]  And, on October 2, 2023, as scheduled, we conducted a show cause

hearing, at which Steven M. Klepper, Esq., represented Mr. Chavis, and James O. Spiker

IV, Deputy Chief Counsel of the Office of Courts and Judicial Affairs within the Office of

the Attorney General of Maryland, represented SBLE.

## DISCUSSION

### Mr. Chavis's Exceptions

Mr. Chavis contends that, in interpreting the ADA, we should adopt the ADA-

related guidance of the Disability Rights Section of the Civil Rights Division of the United

States Department of Justice ("the DOJ") under which "[p]roof of past testing

accommodations in similar test settings is generally sufficient to support a request for the

same testing accommodations for a current standardized exam or other high-stakes test."

Disability Rights Section, Civil Rights Division, United States Department of Justice, ADA

Requirements: Testing Accommodations (updated Feb. 28, 2020), https://www.ada.gov/

resources/testing-accommodations/ [https://perma.cc/3CFT-S4F9].  In other words, Mr.

---

[7]Maryland Rule 19-208 sets forth a show cause standard, namely, whether the party who filed exceptions has met the burden of proving that the exceptions should not be denied, *i.e.*, has met the burden of demonstrating that the exceptions should be granted.  In this case, we are reviewing a recommendation of the ARC, a committee governed by Maryland Rule 19-208, of which section (d) directs that, before this Court, the party who filed exceptions must show cause why the exceptions should not be denied.  Where, as here, when a party is required to show cause, the relevant issue can involve a question of law, such as one of statutory construction, or a question of fact.  "Where questions of law and statutory interpretation are presented, this Court reviews them *de novo*[.]"  Elsberry v. Stanley Martin Cos., LLC, 482 Md. 159, 178, 286 A.3d 1, 12 (2022) (cleaned up).  Similarly, "[a] district court's interpretation, construction, and application of the ADA is reviewed *de novo*."  Langer v. Kiser, 57 F.4th 1085, 1100 (9th Cir. 2023) (citing Robles v. Domino's Pizza, LLC, 913 F.3d 898, 904 (9th Cir. 2019)).

Chavis argues that, where an applicant provides proof of having received a test accommodation in law school, the applicant has met the burden of establishing that an accommodation is warranted for the UBE, and SBLE should provide the same test accommodation without demanding additional documentation.

Mr. Chavis contends that Dr. Lewandowski's "skepticism of accommodations first granted in college and law school is well-known[,]" and disproportionately impacts applicants who are low-income, first-generation immigrants, and/or not white. Mr. Chavis states that SBLE has referred test accommodation requests to Dr. Lewandowski for decades, as shown by In re Application of Kimmer, 392 Md. 251, 257-58, 896 A.2d 1006, 1010-11 (2006), and Matter of K.E., 471 Md. 89, 90, 238 A.3d 277-78 (2020).[8] At the show cause hearing, Mr. Chavis's counsel advised that the referrals have generally resulted in Dr. Lewandowski recommending that the requests be denied.

### The ADA

#### *Test Accommodations*

Although the ADA does not have an express provision stating that public entities must provide reasonable test accommodations for people who request such accommodations based on disability, various parts of the ADA, read together, establish the principle. 42 U.S.C. § 12132, contained in part A of Subchapter II of the ADA (also known

---

[8]Although our two-page order in K.E., 471 Md. at 90, 238 A.3d at 277-78, indicates only that SBLE referred K.E.'s request "to an independent qualified expert[,]" in his exceptions, Mr. Chavis's counsel advises that he was also K.E.'s counsel, that Dr. Lewandowski was the expert in that case, and that K.E. consented to Mr. Chavis's counsel's sharing this information in Mr. Chavis's exceptions.

- 11 -

as Title II), which concerns public entities, prohibits such entities (*e.g.*, the Maryland Judiciary and agencies within it) from discriminating against individuals with disabilities. See 42 U.S.C. § 12132.[9]  Courts have recognized that a claim under Title II may be premised on one of three theories of discrimination: (1) intentional discrimination or disparate treatment; (2) failure to make a reasonable accommodation; and (3) disparate impact.  See, e.g., Richardson v. Clarke, 52 F.4th 614, 619 (4th Cir. 2022); Payan v. L.A. Cmty. Coll. Dist., 11 F.4th 729, 738 (9th Cir. 2021); Hamilton v. Westchester Cnty., 3 F.4th 86, 91 (2d Cir. 2021).

In Title I of the ADA, pertaining to employment, 42 U.S.C. § 12112(b)(5)(A) provides that discrimination against a qualified individual on the basis of disability includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless a covered entity "demonstrate[s] that the accommodation would impose an undue hardship

---

[9]42 U.S.C. § 12131(2), in part A of Title II of the ADA, provides:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

Generally, to establish a *prima facie* case of a Title II violation, a plaintiff must show that: (1) he "is a qualified individual with a disability"; (2) "he was either excluded from participation in, or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against"; and (3) this "exclusion, denial of benefits, or discrimination was 'by reason of his disability.'" Snell v. Neville, 998 F.3d 474, 499 (1st Cir. 2021) (quoting Kiman v. N.H. Dep't of Corrs., 451 F.3d 274, 283 (1st Cir. 2006) (cleaned up)).

on the operation of the business of such covered entity[.]"  In the employment context, it is well settled that an individual who seeks an accommodation under the ADA has the burden of proving that the individual has a disability and that the accommodation would be reasonable and necessary.  See A. L. by & through D.L. v. Walt Disney Parks & Resorts U.S., Inc., 50 F.4th 1097, 1108 (11th Cir. 2022).

With respect to test accommodations, in Title III of the ADA, which concerns public accommodations and services operated by private entities, 42 U.S.C. § 12189 provides that "[a]ny person that offers examinations or courses related to applications[ or] licensing . . . for . . . professional . . . purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."  The word "person" is not defined in Title III.  "Person" is, however, defined in Title I of the ADA, concerning employment, which provides that the term "person" has "the same meaning given" to the term in "section 2000e of this title."  42 U.S.C. § 12111(7).  42 U.S.C. § 2000e(a), part of the Civil Rights Act of 1964, provides in relevant part that "[t]he term 'person' includes . . . governments[ and] governmental agencies[.]"

In reviewing requests for test accommodations, courts in other jurisdictions have interpreted 42 U.S.C. § 12189 as requiring that a State board of law examiners (or State Bar), i.e., public entities, must provide reasonable test accommodations for applicants who establish disability.  In D'Amico v. N.Y. State Bd. of L. Examiners, 813 F. Supp. 217, 218-19 (W.D.N.Y. 1993), an applicant, who suffered from a severe visual disability, requested test accommodations, and the New York State Board of Law Examiners granted requests,

such as providing the applicant with a separate testing room with enhanced lighting and a large print copy of the examination, but denied the applicant's request to take the exam over a four-day period. As a result, the applicant commenced an action "pursuant to the ADA to compel the Board to provide her with 'reasonable accommodations' to take the bar exam over four days rather than two days." Id. at 219. In reviewing the challenge to the Board's denial of the four-day testing period accommodation, the United States District Court for the Western District of New York concluded that, "to succeed on a claim under the ADA, [the applicant] must show (1) that she is disabled, (2) that her requests for accommodations are reasonable, and (3) that those requests have been denied." Id. at 221. The Court determined that the ADA "requires the Board to make 'reasonable accommodations' under the circumstances in light of [the applicant's] disability" and that "[a]n individual analysis must be made with every request for accommodations and the determination of reasonableness must be made on a case by case basis." Id. In concluding that reasonable accommodations must be provided, the Court relied on the definition of "person" in 42 U.S.C. § 12111(7) (which uses the definition set forth in the Civil Rights Act) in interpreting 42 U.S.C. § 12189 as applying not just to private entities but also to public ones. See D'Amico, 813 F. Supp. at 221.

Other courts have used the same standard set forth in D'Amico, under which a State board of law examiners or State Bar must provide an accommodation where evidence demonstrates that an applicant has a disability and that the requested accommodation is reasonable. See In re Reasonable Testing Accommodations of LaFleur, 722 N.W.2d 559, 563 (S.D. 2006) ("[T]he question is whether LaFleur proved that the [South Dakota Board

of Bar Examiners] failed to make reasonable accommodations that would accommodate his disability."); see also Cox v. Ala. State Bar, 330 F. Supp. 2d 1265, 1267 (M.D. Ala. 2004) ("[T]o show a violation of the ADA in connection with testing, a plaintiff must show (1) that he is disabled, (2) that his requests for accommodations are reasonable, and (3) that those requests are denied."  (Citing D'Amico, 813 F. Supp. at 221)); id. at 1267 (The Court also stated that "Plaintiff need only show that there is a substantial likelihood that his request for double time is reasonable within the meaning of the ADA.").  Although there is no language in the ADA expressly requiring that public entities make reasonable test accommodations for applicants who establish disability, it is clear that 42 U.S.C. § 12189 has been interpreted as applying to public entities and that once an applicant establishes disability under 42 U.S.C. § 12102(1), as with other requests for accommodation under the ADA, the applicant must show that the requested accommodation is reasonable.

### *Disability*

The ADA defines the word "disability" in relevant part as follows: "The term 'disability' means, with respect to an individual[,] a physical or mental impairment that substantially limits one or more major life activities of such individual[.]"  42 U.S.C. § 12102(1)(A).[10]  Under the ADA, "major life activities include, but are not limited to, . . .

_____

[10]In full, 42 U.S.C. § 12102(1) provides:

The term "disability" means, with respect to an individual--

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

- 15 -

learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Significantly, the ADA contains the following directive: "The definition of disability in [the ADA] shall be construed in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of" the ADA. 42 U.S.C. § 12102(4)(A).

Like its plain language, the legislative history of 42 U.S.C. § 12102(4)(A) makes clear that Congress intended to make it relatively simple for an individual to establish disability. A significant part of that history is Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002), in which the Supreme Court of the United States held that, "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." The Supreme Court's explanation was partially based on a regulation promulgated by the United States Equal Employment Opportunity Commission ("the EEOC") under which the phrase "'substantially limit[ed]'" in 42 U.S.C. § 12102(1)(A), at the time, meant either "'[u]nable to perform a major life activity that the average person in the general population can perform'" or "'[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'" Id. at 195-96,

_____

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

- 16 -

198 (alterations in original) (citation omitted).  According to the Supreme Court in Williams, id. at 197, the ADA "need[ed] to be interpreted strictly to create a demanding standard for qualifying as disabled[.]"  (Citation omitted).

Williams, however, did not remain good law for long.  Six years after the Supreme Court issued Williams, Congress passed the ADA Amendments Act of 2008, through which it created the directive in 42 U.S.C. § 12102(4)(A) for courts and other decisionmakers to broadly construe the definition of the word "disability" under the ADA.  See ADA Amendments Act of 2008, Pub. L. No. 110-325, § 4(a), available at https://www. eeoc.gov/statutes/ada-amendments-act-2008        [https://perma.cc/2HCW-TZMM].  Significantly, in the section of the ADA Amendments Act of 2008 that contained legislative findings and purposes, Congress declared "that the question of whether an individual's impairment is a disability under the ADA **should not demand extensive analysis[.]**"  Pub. L. No. 110-325, § 2(b)(5) (emphasis added).  Congress expressly repudiated Williams, stating that the Supreme Court's reasoning in the case "narrowed the broad scope of protection intended to be afforded by the ADA" and "interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress[.]"  Pub. L. No. 110-325, § 2(a)(5), (a)(7).  Congress stated that one purpose of the ADA Amendments Act of 2008 was "to reject" the Supreme Court's reasoning in Williams that the ADA "'need[ed] to be interpreted strictly to create a demanding standard for qualifying as disabled'" and that the phrase "substantially limit[ed]" in 42 U.S.C. § 12102(1)(A) was synonymous with the phrase "significantly restrict[ed.]"  Pub. L. No. 110-325, § 2(b)(4).  Congress stated that it expected the EEOC to revise the regulation in

which it equated the two phrases.  See Pub. L. No. 110-325, § 2(b)(6).

The EEOC did so, and the relevant regulation now reads that "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  29 C.F.R. § 1630.2(j)(1)(ii).  Consistent with the ADA Amendments Act of 2008, the regulation also acknowledges that the phrase "[s]ubstantially limits[,]" which is set forth in the definition of the word disability in 42 U.S.C. § 12102(1)(A),  "is not meant to be a demanding standard" and that "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis."  29 C.F.R. § 1630.2(j)(1)(i), (iii).

In addition to disability determinations not requiring extensive analysis, the ADA makes clear that conclusions with respect to disability must be made on an individualized, fact-specific, case-by-case basis.  As indicated by the phrase "with respect to an individual" in the definition of the word "disability" in 42 U.S.C. § 12102(1)(A), "[d]etermining whether a plaintiff has a disability [] requires an individualized assessment of the impact of the impairment on an individual's major life activities."  Mueck v. La Grange Acquisitions, L.P., 75 F.4th 469, 479 (5th Cir. 2023), as revised (Aug. 4, 2023) (cleaned up); see also 29 C.F.R. § 1630.2(j)(1)(iv) ("The determination of whether an impairment substantially limits a major life activity requires an individualized assessment.").  Similarly, the question of "[w]hether an accommodation is reasonable depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the [] individual's circumstances and the potential accommodations."  Dunlap v. Liberty Nat. Prods., Inc., 878 F.3d 794, 799 (9th Cir. 2017) (cleaned up).

## **Kimmer** and **K.E.**

As far as our research reveals, the only reported orders or opinions involving test accommodation requests in Maryland are the two that Mr. Chavis cites—*i.e.*, Kimmer, 392 Md. 251, 896 A.2d 1006 (an opinion), and K.E., 471 Md. 89, 238 A.3d 277 (an order). In Kimmer, K.E., and this case, an applicant requested additional time to take the bar examination, SBLE referred the matter to Dr. Lewandowski, who opined that the applicant did not qualify for the amount of additional time requested, and SBLE either denied the test accommodation request (in Kimmer and this case) or only partially granted the request (in K.E.). See Kimmer, 392 Md. at 257-58, 896 A.2d at 1010-11; K.E., 471 Md. at 90, 238 A.3d at 278. K.E. sought 100% additional time to take the UBE, but Dr. Lewandowski recommended (and SBLE agreed) that K.E. should receive only 25% additional time. See id. at 90, 238 A.3d at 278. The ARC recommended upholding SBLE's decision, and we did so. See id. at 90-91, 238 A.3d at 278.

Unlike in K.E. and this case—which involved applicants' exceptions to recommendations of the ARC concerning requests for test accommodations—in Kimmer, 392 Md. at 260-63, 274, 896 A.2d at 1012-14, 1020, we addressed SBLE's exceptions to Mr. Kimmer's admission to the Bar. Mr. Kimmer had passed the bar examination after a circuit court ordered, as injunctive relief, that SBLE provide him with the test accommodation that he had requested (namely, 100% additional time). See id. at 260-62, 896 A.2d at 1012-13. We sustained SBLE's exceptions to Mr. Kimmer's admission, concluding that, instead of seeking injunctive relief in the circuit court, Mr. Kimmer was required to seek review of SBLE's denial of his test accommodation request in this Court,

which has exclusive jurisdiction over the bar admission process.  See id. at 278, 896 A.2d at 1023.

**The Board Rules**

Board Rule 3(a) states in pertinent part that, "[i]n accordance with the ADA, [SBLE] shall provide test accommodations to an individual taking the bar examination . . . , to the extent that such accommodations are reasonable, consistent with the nature and purpose of the examination and necessitated by the applicant's disability."  Significantly, it is SBLE, not this Court, that adopts and amends "the Rules of the State Board of Law Examiners" (or "the Board Rules," for short).[11]  Maryland Rule 19-102(c)(2) sets forth SBLE's authority to do so, stating: "[SBLE] may adopt rules to carry out the requirements of this Chapter and Chapter 200 of this Title.  The Rules of [SBLE] shall follow Chapter 200 of Title 19."

SBLE has had this authority since it originally adopted the Board Rules in or before the 1980s.  One early reference to the Board Rules was in Application of Mark W., 303 Md. 1, 4 n.1, 491 A.2d 576, 577 n.1 (1985), in which we observed that "[p]ower is granted to [SBLE] to define by rule the subject matter of the examination" for out-of-State attorneys, and then quoted the existing version of Board Rule 3, which pertained to that examination.

---

[11]The Board Rules are not to be confused with the former Rules Governing Admission to the Bar, which, in 2016, we transferred to Chapter 200 (Admission to the Bar) of Title 19 (Attorneys) of the Maryland Rules.

Later, SBLE amended Board Rule 3 so that it would apply to test accommodation requests as to the bar examination made pursuant to the ADA. The exact date of this amendment is unclear, given that, unlike with amendments to the Maryland Rules over the past two decades (which are available on the Maryland Judiciary's website), there is no public history of amendments to the Board Rules.[12] We at least know that the amendment to Board Rule 3 must have happened at some point in the sixteen years between 1990 (when Congress enacted the ADA) and 2006 (when we referred to the new version of Board Rule 3 in Kimmer, 392 Md. at 257 n.5, 896 A.2d at 1010 n.5).

As with the timing of the amendment to Board Rule 3, because we did not have a role in approving the rule, we do not know the origin of its requirement that test accommodations be "reasonable, consistent with the nature and purpose of the examination and necessitated by the applicant's disability." Bd. R. 3(a). That said, we know that this language is not unique. Rules in at least five other States—namely, Arizona, Delaware, Missouri, New York, and Oregon—contain substantively identical language.[13] And,

---

[12]Under Maryland Rule 19-102(d), "[a]ny amendment of the Board[ R]ules shall be posted on the Judiciary website at least 45 days before the amendment is to become effective." That Rule, however, does not require that prior versions of Board Rules be posted on the Judiciary's website.

[13]See Ariz. S. Ct. R. 35(b)5 ("reasonable, consistent with the nature and purpose of the examination, and necessitated by the applicant's disability"); Mo. Bar R. 8.08 n.10 (same); Del. R. Bd. of Bar Examiners 15(a) ("timely requested, reasonable, consistent with the nature and purpose of the Bar Examination, not unduly burdensome, and necessitated by the applicant's disability"); N.Y. Ct. R. 6000.7(a) ("timely requested, reasonable, not unduly burdensome, consistent with the nature and purpose of the examination and necessitated by the applicant's disability"); Or. R. for Admission of Attorneys 5.10(3) ("reasonable, not unduly burdensome, consistent with the nature and purpose of the examination and which does not fundamentally alter the nature of the examination as necessitated by the applicant's disability").

substantively identical language appears on the websites of boards of law examiners in at least four additional States—to wit, Connecticut, Illinois, Indiana, and New Jersey.[14]  It possible that some version of this language was drafted as a model rule—perhaps by the National Conference of Bar Examiners—and then adopted, with minor variations, by boards of law examiners in multiple jurisdictions, including Maryland.  The language is also similar to that of 28 C.F.R. § 35.130(b)(7)(i), which provides: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

By its express terms, the ADA establishes a floor, or minimum standards for the protection of rights of individuals with disabilities.  42 U.S.C. § 12201(b) allows States to

---

[14]See Connecticut Bar Examining Committee, Instructions for Filing Petition for Non-Standard Testing Conditions on the Connecticut Bar Examination (2016), https://www.jud.ct.gov/cbec/instrucNST.htm  [https://perma.cc/7XJY-8DFJ]  ("reasonable, consistent with the nature and purpose of the examination, and necessitated by the applicant's disability"); Indiana State Board of Law Examiners, Information & Applications » Bar Exam » Testing Accommodations Application Instructions (2023), https://myble.courts.in.gov/browseform.action?applicationId=9&formId=19  [https://perma.cc/N7P5-DLMQ] (same); Illinois Board of Admissions to the Bar, Information & Applications » NTA » Nonstandard Testing Accommodation (2023), https://www.ilbaradmissions.org/appinfo.action?id=9  [https://perma.cc/Y88T-MKF7]  ("reasonable, consistent with the nature and purpose of the examination, and necessitated, in each instance, by the disability of the applicant"); New Jersey Board of Bar Examiners, Information & Applications » Non-Standard Testing Accommodations » Non-Standard Testing Accommodations (NTA) Instructions (2023), https://www.njbarexams.org/browseform.action?applicationId=9&formId=6  [https://perma.cc/U8ZD-SAHX] ("reasonable, consistent with the nature and purpose of the examination, and necessitated by the candidate's disabilities").

give more protection than the floor set by the ADA, stating in pertinent part that "[n]othing in [the ADA] shall be construed to invalidate or limit the remedies, rights, and procedures of any . . . law of any State . . . that provides greater or equal protection for the rights of individuals with disabilities than are afforded by" the ADA. In other words, under 42 U.S.C. § 12201(b), "the ADA does not preempt state laws that provide greater protection to [an individual] with a disability." Campbell v. Universal City Dev. Partners, Ltd., 72 F.4th 1245, 1257 (11th Cir. 2023).

At the same time, 42 U.S.C. § 12201(b) indicates that States cannot go below the floor set by the ADA by requiring individuals with disabilities to meet a higher standard than the one under the ADA—*i.e.*, "a state law that provides *less* protection than the ADA to [an individual] with a disability is preempted." Campbell, 72 F.4th at 1257 (emphasis in original). It follows that "the ADA preempts inconsistent state law when appropriate and necessary to effectuate a reasonable accommodation[.]" Mary Jo C. v. N. Y. State & Loc. Ret. Sys., 707 F.3d 144, 164 (2d Cir. 2013) (citations omitted). "The court's obligation under the ADA is to ensure that the decision reached by the state authority is appropriate under the law and in light of proposed alternatives." Id. (cleaned up). "Otherwise, any state could adopt requirements imposing unreasonable obstacles to [individuals with disabilities], and when haled into court could evade the antidiscrimination mandate of the ADA merely by explaining that the state authority considered possible modifications and rejected them." Id. (citation omitted).

So, despite our grant of authority to SBLE to adopt and amend the Board Rules, see Md. R. 19-102(c)(2), given that federal law prevents a State from requiring individuals

with disabilities to meet a higher standard than the one established under the ADA to be afforded an accommodation, the Board Rules cannot impose a higher burden than the ADA does when it comes to determining whether to grant an applicant's test accommodation request. In other words, SBLE cannot, through its Board Rules, raise the requirements established by the ADA for accommodation requests to be granted. Although the ADA requires proof that the applicant has a disability and that the requested test accommodation would be reasonable, there is no express obligation under the ADA for an applicant to prove that the requested test accommodation would also be "consistent with the nature and purpose of the examination and necessitated by the applicant's disability." Bd. R. 3(a).

In our view, SBLE's requirement that a requested accommodation be consistent with the nature and purpose of the UBE and necessitated by the applicant's disability is intertwined with the question of reasonableness and is not a requirement that imposes additional hurdles or burdens of proof, but rather is part of the reasonableness analysis. The requirement that a test accommodation be reasonable is fulfilled in part by showing that a person has an impairment that involves a need for a test accommodation. In other words, part of a determination that a test accommodation is reasonable is that the accommodation is necessitated by the disability. Once a person establishes that the person has an impairment that meets the definition of a disability under the ADA, this would be a relatively low threshold to meet. For instance, where a person establishes that the person has a physical or mental impairment that substantially limits one or more major life activities of the individual, such as "learning, reading, concentrating, thinking, communicating, and working[,]" 42 U.S.C. § 12102(2)(A), this would, in most instances,

- 24 -

automatically demonstrate that the person has an impairment that implicates the necessity for a test accommodation on the bar examination.

That the requested test accommodation must be consistent with the nature of the purpose of the bar examination would also not impose an additional hurdle outside of the realm of reasonableness. A basic premise of the bar examination is that it is an exam that is intended to test an applicant's knowledge of designated areas of the law. See Md. R. 19-203(c) ("The purpose of the bar examination is to enable applicants to demonstrate their capacity to achieve mastery of foundational legal doctrines, proficiency in fundamental legal skills, and competence in applying both to solve legal problems consistent with the highest ethical standards."). A requested test accommodation would be consistent with the nature and purpose of the bar examination so long as that basic purpose can be achieved. On the other hand, a requested test accommodation might be inconsistent with the nature and purpose of the examination where, for example, the request sought to excuse an applicant from taking all or a portion of the bar examination and, as such, would be an unreasonable request.

**Mr. Chavis's Test Accommodation Request**

In this case, we conclude that Mr. Chavis has met the burden of proving that he is an individual with a condition that meets the definition of the word "disability" under the ADA and that the test accommodation that he requested—*i.e.*, 50% additional time to take the UBE—would be "reasonable, consistent with the nature and purpose of the examination and necessitated by [his] disability." Bd. R. 3(a). In assessing the ADA's application to the circumstances of this case, we are mindful that, under the ADA and related federal

regulations, the definition of disability should be broadly construed, and evidence of past test accommodations must be given considerable weight. Under 42 U.S.C. § 12102(4)(A), we must construe the definition of the word "disability" "in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of" the Act. And, under the ADA Amendments Act of 2008 and the regulation in which the EEOC implemented the Act, the question of whether an individual has a disability under the ADA "should not demand extensive analysis[,]" and the phrase "substantially limits" in the definition of the word "disability" should not be strictly interpreted, or deemed to set forth "a demanding standard[,]" or viewed as synonymous with the phrase "significantly restricts." Pub. L. No. 110-325, § 2(b)(4), (5); 29 C.F.R. § 1630.2(j)(1)(i)-(iii).

In addition, the DOJ has promulgated a regulation that provides that "[a]ny private entity that offers examinations or courses related to applications[ or] licensing" "must assure that . . . [w]hen considering requests for modifications, accommodations, or auxiliary aids or services, the entity gives considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations[.]" 28 C.F.R. § 36.309(a), (b)(1)(v). The DOJ interprets 28 C.F.R. § 36.309, which concerns examinations offered by private entities, to apply to public entities offering examinations related to applications or licensing, not just private entities offering such examinations.[15] As such, according to the DOJ's interpretation of its regulation, when

---

[15]Under 42 U.S.C. § 12134(a), Congress authorized the Attorney General to promulgate regulations to implement Part A of Title II of the ADA. As a result, the DOJ has promulgated regulations implementing Part A of Title II of the ADA. See 28 C.F.R. §

considering a request for a test accommodation, any public entity offering a licensing examination such as the bar examination must give considerable weight to documentation of past accommodations received in similar testing situations. See 28 C.F.R. § 36.309(b)(1)(v).

This Court has not yet addressed the appropriate test to be used for determining whether a test accommodation request for the bar examination should be granted, and the Maryland Rules do not set forth such a test. In reviewing denials of test accommodation requests as to bar examinations, some courts in other jurisdictions have used a standard under which the court first confirms that the applicant has a disability, and then determines

---

35.101(a) ("The purpose of this part is to implement subtitle A of title II of the [ADA], as amended by the ADA Amendments Act of 2008 . . . , which prohibits discrimination on the basis of disability by public entities.").

In a document titled "Appendix A to Part 35—Guidance to Revisions to ADA Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services," the DOJ addressed a "comment requesting that it specifically include language regarding examinations and courses in the title II regulation[s]." In response to the comment, the DOJ stated:

> Because section 309 of the ADA 42 U.S.C. 12189, reaches "[a]ny person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post secondary education, professional, or trade purposes," public entities also are covered by this section of the ADA. Indeed, the requirements contained in title II (including the general prohibitions against discrimination, the program access requirements, the reasonable modifications requirements, and the communications requirements) apply to courses and examinations administered by public entities that meet the requirements of section 309. While the Department considers these requirements to be sufficient to ensure that examinations and courses administered by public entities meet the section 309 requirements, the Department acknowledges that the title III regulation, because it addresses examinations in some detail, is useful as a guide for determining what constitutes discriminatory conduct by a public entity in testing situations. See 28 CFR 36.309.

whether the requested test accommodation would be reasonable. As explained earlier, in D'Amico, 813 F. Supp. at 221, the United States District Court for the Western District of New York stated that, "to succeed on a claim under the ADA, plaintiff must show (1) that she is disabled, (2) that her requests for accommodations are reasonable, and (3) that those requests have been denied." In other cases involving requests for accommodations on bar examinations, courts have utilized the standard set forth in D'Amico. See LaFleur, 722 N.W.2d at 562; Cox, 330 F. Supp. 2d at 1267.[16]

With these cases in mind, we adopt a different two-step test for determining whether a bar examination test accommodation request should be granted than the test used to evaluate Mr. Chavis's request in this case. Under the two-step test that we adopt today, the first step is to determine whether the applicant meets the definition of the word "disability" under the ADA—*i.e.*, whether the applicant has "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. § 12102(1)(A). Although the ARC and Dr. Lewandowski referred to this determination as "the second criterion[,]" it is actually the first step. The second step is to determine whether the test accommodation requested by the applicant would be "reasonable, consistent with the nature and purpose of the examination and necessitated by the applicant's disability." Bd. R. 3(a). In other words, the first prong of the test requires

---

[16]Under a rule that another State supreme court has adopted for test accommodation requests, "[t]he Applicant must demonstrate that: (1) she or he is disabled as defined by the ADA; and (2) the disability impacts her or his ability to take the Bar Examination; and (3) the accommodation requested is necessary to meet the limitation caused by the disability." Utah S. Ct. R. 14-706(a) (paragraph breaks omitted).

that an applicant satisfy the definition of disability under the ADA, and the second prong of the test requires, as the ADA does, that the accommodation be reasonable and incorporates language from Board Rule 3(a), requiring that the accommodation be consistent with the nature and purpose of the examination and necessitated by the applicant's disability.[17]  The second part of the test is also consistent with 28 C.F.R. § 35.130(b)(7)(i), which is part of the DOJ's regulations interpreting Title II of the ADA applicable to public entities.

Applying this test, we are satisfied that Mr. Chavis has produced evidence sufficient to establish that he has a condition that meets the definition of "disability" under the ADA and that his request for 50% additional time to take the UBE is reasonable.  Mr. Chavis has established that he has a "mental impairment that substantially limits [] major life activities[,]" 42 U.S.C. § 12102(1)(A)—namely, "learning, reading, concentrating, thinking, communicating, and working[,]" 42 U.S.C. § 12102(2)(A).  On the ADHD Verification Form promulgated by Southern University Law Center, Dr. Thiebaud indicated that Mr. Chavis met the "full [] criteria" set forth in the DSM-IV for "ADHD[,] inattentive type"—*i.e.*, Dr. Thiebaud diagnosed Mr. Chavis with ADHD.  Dr. Thiebaud

---

[17]In addition to being similar to tests used in other jurisdictions to evaluate test accommodation requests for bar examinations, this two-step test is similar to the standard for "a failure-to-accommodate claim" against an employer pursuant to the ADA, under which "a plaintiff must show that (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." Mueck, 75 F.4th at 485 (cleaned up).  In an employment failure to accommodate claim, it must be ascertained whether denying the applicant's accommodation request would amount to "not making reasonable accommodations to the known physical or mental limitations of" the applicant.  42 U.S.C. § 12112(b)(5)(A).

explained that Mr. Chavis's symptoms of ADHD were not limited to academic environments, and that he has difficulty completing tasks, and often leaves them undone, at work and at home. According to Dr. Thiebaud, Mr. Chavis self-reported symptoms of ADHD included "poor attention and focus[,]" taking "longer to complete tasks[,]" and often not completing "tasks due to distraction" at school, work, and home, and indicated that he was first diagnosed with ADHD at age 8.[18] Dr. Thiebaud also noted that Mr. Chavis had taken Adderall, which, as previously explained, is a prescription medication used to treat ADHD. And, in response to a question on the ADHD Verification Form asking: "What evidence has been reviewed to indicate that ADHD symptoms cause the applicant difficulty taking tests?", Dr. Thiebaud stated: "Personal experience and neuropsychiatric testing[.]"[19]

Under these circumstances, Mr. Chavis has demonstrated not only that he has ADHD, but also that he has a disability as described under the ADA. The ARC, SBLE, and Dr. Lewandowski were mistaken in reasoning that the ADHD Verification Form did

---

[18]We are aware that, at the hearing before the ARC, during his cross-examination, Mr. Chavis candidly acknowledged that he did not have documentation proving that he was diagnosed with a mental health condition as a child. Mr. Chavis testified that a statement by his mother was the source of his belief that he was first diagnosed with ADHD at age 8. We are also aware that Mr. Chavis attached to his test accommodation request an unsigned medical record from Allstar Community Care, LLC dated August 10, 2022, which stated that Mr. Chavis "need[ed] to be assessed for ADHD, [and was] likely not diagnosed in his early years due to the athleticism program." The circumstance that Mr. Chavis has not conclusively proven that he was diagnosed with ADHD at age 8 is not dispositive of whether Mr. Chavis has a disability under the ADA that warrants a test accommodation.

[19]Although Dr. Thiebaud did not indicate what Mr. Chavis's neuropsychiatric test results had been, Dr. Thiebaud clearly stated on the ADHD Verification Form that he based his diagnosis and findings on personal experience and neuropsychiatric testing.

not establish that Mr. Chavis has an impairment that substantially limits major life activities. This reasoning was at odds with a straightforward application of the plain language and legislative history of the ADA to the circumstances of this case. Such an application demonstrates that Mr. Chavis's diagnosis of ADHD under the DSM-IV cleared the low bar for establishing a disability under the ADA.

Although we have no reason to doubt Dr. Lewandowski's qualifications or credentials, we do not owe deference to his opinion that Mr. Chavis failed to establish an impairment that substantially limits major life activities or to his determination as to the two-step test to be used for evaluating test accommodation requests. To be sure, Dr. Lewandowski was permitted to provide an opinion to SBLE under Board Rule 3(c)(2), but there is no authority indicating that his opinion would be entitled to any degree of deference or that it would be treated any differently than the way we would assess any other expert opinion. Cf. Long v. Injured Workers' Ins. Fund, 448 Md. 253, 264, 138 A.3d 1225, 1231-32 (2016) ("We must respect the expertise of [an administrative] agency and accord deference to its interpretation of a statute that it administers; however, we may always determine whether the administrative agency made an error of law." (Citation omitted)).

To the extent that Dr. Lewandowski set forth a two-pronged test for what an applicant is required to prove in order to obtain a test accommodation—*i.e.*, (1) the applicant must have "an evidence-based diagnosis of a mental or physical disorder from a qualified professional"; and (2) "the disorder substantially limits them in a major life activity as compared to most people"—it is possible that Dr. Lewandowski was relying, in part, on information put forth by SBLE indicating that all reports of health professionals

- 31 -

supplied by an applicant seeking a test accommodation must reference evaluations conducted within the past three years and, in some cases of permanent disabilities, testing conducted within the past five years if the applicant was over the age of eighteen at the time of testing.[20] See SBLE, Applicant's Request for A.D.A. Test Accommodations for the UBE in Maryland at 4 (revised May 2023), available at https://www.mdcourts.gov/sites/default/files/import/ble/pdfs/testaccommodationsrequestf orm.pdf [https://perma.cc/FB3J-6ULD] ("SBLE's Test Accommodation Request Form"). But, in his report, Dr. Lewandowski did not disclose a citation or provide any authority as to the source of this two-part test. This enters into the realm of an expert offering an opinion as to the law, *i.e.,* an opinion as to the legal requirements necessary for a test accommodation to be granted. In other words, Dr. Lewandowski's report exceeded that of an expert opining as to whether an applicant met established requirements for a test accommodation and roved into setting forth his own definition of the necessary requirements. Generally, no witness—including an expert—is "permitted to express an opinion on a question of law." Jones v. State, 425 Md. 1, 28, 38 A.3d 333, 349 (2012) (cleaned up).

Another significant issue with the analyses of the ARC, SBLE, and Dr. Lewandowski is that they were all evidently under the impression that: (1) Mr. Chavis was required to prove that he had been diagnosed with ADHD and that he failed to do so; and

---

[20]Both SBLE and the ARC evidently applied Dr. Lewandowski's two-step test. SBLE determined that Mr. Chavis failed both steps, whereas the ARC seemed to assume, without deciding, that Mr. Chavis may have fulfilled the first step, and then reasoned that he failed the second.

(2) Dr. Thiebaud's diagnosis and findings were insufficient because they were not supported by specified test results and were partially based on information that Mr. Chavis self-reported. For instance, in the current version of SBLE's Test Accommodation Request Form, under the heading "Evaluation Report by Health Professional - Contents" on page 4, SBLE indicates that, for it to grant a test accommodation request, a disability must have been diagnosed, and, if the diagnosis is of a learning disability, the diagnosis must be supported by comprehensive test data and cannot rely solely on self-reporting by the applicant, and if the diagnosis is of ADHD, likewise, it cannot properly be based solely on information that the applicant self-reported. See SBLE's Test Accommodation Request Form, supra, at 4.

In SBLE's Test Accommodation Request Form, the paragraph regarding learning disabilities states in pertinent part: "The diagnosis must be based on evidence that does not rely solely on self-reporting by the candidate. Provide comprehensive test data (using standard scores), including IQ, achievement, language, and other cognitive measures that inform the diagnosis." Id. (emphasis omitted). Similarly, the paragraph regarding ADHD states in pertinent part that "[t]he Evaluation Report must address the full, standard criteria for ADHD determination with an explanation of differential diagnosis, an evaluation of current impact of symptoms, and a clinical summary supported by a rationale" and that "[t]he report must provide evidence that this diagnosis does not rely solely on self-reporting in establishing developmental history, current symptoms, and evidence of clinically significant impairment." Id. (emphasis omitted).

In his report, Dr. Lewandowski stated that the ADHD Verification Form did not

indicate whether Dr. Thiebaud "completed tests of attention, intelligence, reading, writing, or other functions needed to perform the" UBE, "provided no evidence to support" the assertion that Mr. Chavis has attention issues, and might have been simply "paraphrasing complaints made by" Mr. Chavis. In their determinations, both SBLE and the ARC referred to an alleged lack of "objective evidence" of a substantial limitation in a major life activity. This indicates that SBLE and the ARC shared Dr. Lewandowski's view that Mr. Chavis could not rely on Dr. Thiebaud's diagnosis and findings because they were not supported by specified test results and were partially based on information that Mr. Chavis self-reported.

There is no legal support for the proposition that, to qualify for a test accommodation, an applicant must prove an evidence-based diagnosis—which the ARC and Dr. Lewandowski identified as the first criterion, or the first part of the two-step test. Nothing in the ADA requires proof of a diagnosis, let alone proof of an evidence-based diagnosis, for relief. The definition of disability under the ADA does not refer to establishing a diagnosis, and instead simply requires that the individual have "a physical or mental impairment that substantially limits one or more major life activities[.]" 42 U.S.C. § 12102(1)(A). Likewise, 29 C.F.R. § 1630.2—the EEOC's regulation regarding definitions under the ADA—is also silent as to diagnoses. Simply put, "a diagnosis is not necessary for an ADA claim to succeed[.]" Hrdlicka v. Gen. Motors, LLC, 63 F.4th 555, 568 (6th Cir. 2023) (citation omitted). Although he contended otherwise at the hearing before the ARC, SBLE's counsel correctly acknowledged at the show cause hearing that "a formal diagnosis is not necessary." By concluding that a diagnosis supported by test

results is necessary for a test accommodation to be granted, the ARC, SBLE, and Dr. Lewandowski used a criterion that exceeded the definition of the word "disability" under the ADA and, in doing so, applied a higher standard in evaluating Mr. Chavis's request than what is required under the ADA.

Nonetheless, even though he was not required to do so, Mr. Chavis proved that he was diagnosed with ADHD. In the ADHD Verification Form, Dr. Thiebaud stated that Mr. Chavis met the "full [] criteria" set forth in the DSM-IV for "ADHD[,] inattentive type[.]" In substance, this clearly constituted a diagnosis by Dr. Thiebaud of Mr. Chavis's ADHD, even though Dr. Thiebaud did not use the word "diagnose." And, unlike Dr. Lewandowski, who reviewed documents and did not evaluate Mr. Chavis himself, Dr. Thiebaud evaluated Mr. Chavis. "[W]here [a] claimant's credibility is a central factor in [a] disability determination[,] . . . the impressions of examining doctors sensibly may be given more weight than those who looked only at paper records." Gross v. Sun Life Assurance Co. of Canada, 880 F.3d 1, 14 (1st Cir. 2018) (citations omitted).

Dr. Thiebaud's diagnosis and findings concerning Mr. Chavis having ADHD were sufficient to establish a disability even though they were not accompanied by specified test results and were partially based on information that Mr. Chavis self-reported. Given that the ADA does not require a diagnosis in the first place, it follows that the ADA does not require a diagnosis to be supported by specified test results. Further, routinely requiring that an applicant for admission to the bar submit specific test results in support of a physician's diagnosis when requesting a test accommodation could be inconsistent with 28 C.F.R. § 36.309(a) and (b)(iv), which provide that "[a]ny private entity that offers

examinations or courses related to applications[ or] licensing" "must assure that . . . [a]ny request for documentation, if such documentation is required, is reasonable and limited to the need for the . . . accommodation . . . requested."

As to Mr. Chavis's self-reporting of symptoms, "it should require no citation to medical texts to conclude that[,] when a doctor begins treating a new patient[,] he has a duty to familiarize himself with a patient's past treatment history, and that the doctor may rely on that history in making treatment decisions." Changkit v. D.C. Dep't of Emp. Servs., 994 A.2d 380, 389 (D.C. 2010), as amended (Aug. 12, 2010) (cleaned up). "Just about any visit to a doctor begins with self-reporting: What are your symptoms? When did they start? How severe is the pain?" United States v. Sanjar, 876 F.3d 725, 745 (5th Cir. 2017). "The importance of self-reporting, especially for mental illnesses for which there is often little corroborating visual evidence that modern medicine has for many physical ailments, is evident[.]" Id. As the United States District Court for the Northern District of California observed about the National Conference of Bar Examiners ("the NCBE") in Enyart v. Nat'l Conf. of Bar Examiners, Inc., 823 F. Supp. 2d 995, 1007 (N.D. Cal. 2011), a case involving alleged violations of the ADA on the part of the NCBE, the ARC, SBLE, and Dr. Lewandowski have "point[ed] to no citation or evidence" that would "support challenging a doctor's testimony on the basis that it relies in part on a patient's self[-]report."

We share the ARC's concern that SBLE seems to be of the view "that it is unlikely that a disability would not appear and/or be diagnosed until later in one's life and/or that reasonable accommodations should be requested before law school for the same to be considered valid for the" UBE. On page 4 of SBLE's Test Accommodation Request Form,

- 36 -

the paragraph pertaining to learning disabilities states: "Learning disabilities are developmental disorders that emerge in childhood and most often are diagnosed and treated during childhood. Provide a detailed history of developmental and psychoeducational difficulties beginning with the first manifestations of the disability." SBLE's Test Accommodation Request Form, supra, at 4. Similarly, the paragraph regarding ADHD states in pertinent part: "ADHD disorders are manifested developmentally." Id.[21] And, at the hearing before the ARC, when cross-examining Mr. Chavis, SBLE's counsel repeatedly asked him questions regarding the lack of childhood records, such as documentation that he was first diagnosed with ADHD at age 8.

In this case, that Mr. Chavis did not seek a diagnosis or test accommodations until law school appears to have been held against him. In his report, Dr. Lewandowski repeatedly mentioned the lack of childhood records documenting that Mr. Chavis was first diagnosed with ADHD at age 8, and pointed out that Mr. Chavis "never requested test accommodations until law school." Similarly, at the hearing before the ARC, Dr. Lewandowski testified: "[T]he lion's share of individuals with ADHD, since it's a neurodevelopmental disorder, have childhood evidence. This is not something that typically crops up in law school." As a whole, the testimony given by Dr. Lewandowski and his report indicate that, in this case, he viewed the absence of evidence that Mr. Chavis

---

[21]SBLE might wish to consider revising page 4 of its Test Accommodation Request Form, given that the page states that, for SBLE to grant a test accommodation request, the disability must have been diagnosed, and, if the diagnosis is of ADHD, the diagnosis cannot properly be based solely on information that the applicant self-reported as to "developmental history, current symptoms, and evidence of clinically significant impairment." SBLE's Test Accommodation Request Form, supra, at 4.

had ADHD as a child as evidence of the absence of a valid ADHD diagnosis in law school.

We do not share this view. As the ARC explained in discussing its concern, "evidence could certainly be presented that would clearly show a latent yet proper diagnosis and/or that reasonable accommodations were requested and received by a[n applicant] later in their educational" career. It may be entirely understandable that an applicant might not seek a diagnosis and/or test accommodations until the applicant is well into adulthood. In our view, Mr. Chavis's testimony at the hearing before the ARC furnishes logical examples of possible reasons for such a delay—namely, the incorrect view that attention issues are behavioral problems rather than learning disabilities, parents who see discipline as the solution to such issues, and fear of embarrassment and stigmatization in school.

We also not persuaded by the argument that Mr. Chavis's request should be denied on the ground that he provided SBLE with incomplete documentation. The basis for this allegation appears to be that the record does not contain documents that SBLE contends should have been attached to the ADHD Verification Form. On the form, Dr. Thiebaud checked the box next to "YES" under the question: "Has formal cognitive and/or psychological testing been administered to the applicant?", and, below that question, the form stated: "If you answered 'yes' to the preceding question, attach a complete copy of the report, including test scores." At the show cause hearing, SBLE's counsel suggested that Mr. Chavis might have provided additional documentation to Southern University Law Center along with the ADHD Verification Form, but failed to provide the same documentation to SBLE. We are unconvinced. The language in the ADHD Verification

Form regarding attaching "a complete copy of the report" is part of the boilerplate language of the form, and is not an independent representation by Dr. Thiebaud that there was, in fact, a report.

At the hearing before the ARC, Mr. Chavis confirmed multiple times that he had provided SBLE with all of the relevant documentation in his possession. Shortly after the hearing began, the Chair of the ARC listed all of the documents that the ARC had been provided. Later, the Chair of the ARC asked Mr. Chavis: "[A]re there any other documents that you have that I didn't mention or that you didn't previously provide?" Mr. Chavis responded: "No. I turned in everything I have, my application, my letters from the schools, everything that I used to apply is what I'm turning in. I don't have any extra documents to turn in." Still later, during Mr. Chavis's cross-examination, SBLE's counsel drew his attention to the language in the ADHD Verification Form regarding "a complete copy of the report," and then asked him whether a document was attached to the form when he submitted it to Southern University Law Center. Mr. Chavis responded in pertinent part: "[E]verything that was turned in to you guys is what I have." We see no reason to conclude that the record conflicts with Mr. Chavis's testimony.

Having determined that Mr. Chavis proved that he has a disability under the ADA, we next conclude that the test accommodation that Mr. Chavis requested—*i.e.*, 50% additional time—would be reasonable, consistent with the nature and purpose of the UBE, and necessitated by Mr. Chavis's ADHD. As discussed, determining whether a requested accommodation is consistent with the nature and purpose of the bar examination and necessary should impose no greater burden than that inherent in the reasonableness

requirement of the ADA. In this case, Dr. Thiebaud recommended that Mr. Chavis be given "additional time to complete exams and [an] isolated testing environment to limit distractions[,] if possible." Two different law schools implemented Dr. Thiebaud's recommendation, providing Mr. Chavis with 50% additional time for exams and quizzes and the ability to take them in a low-distraction testing room. The University of the District of Columbia David A. Clarke School of Law also provided Mr. Chavis with the ability to take five- to ten-minute breaks during classes and tests and the use of two pieces of assistive technology, including one designed to assist with notetaking. In short, Dr. Thiebaud's findings, diagnosis of ADHD, and recommendation were sufficient for two different law schools to provide Mr. Chavis with 50% additional time to take exams in addition to other types of accommodations. This was more than enough to demonstrate that providing Mr. Chavis 50% additional time to take the UBE would be reasonable and necessitated by his disability, and in no way inconsistent with the nature and purpose of the bar examination.

In recommending that SBLE's denial of Mr. Chavis's request be upheld, the ARC determined that Mr. Chavis failed to show a nexus between the test accommodations afforded him in law school and the need for a test accommodation as to the UBE. We hasten to point out that an applicant who is requesting an accommodation for the bar examination is not required to demonstrate that a prior test accommodation was given in law school or in any other setting, or that there is a "nexus" between the bar examination and any other test for which an accommodation may have been afforded in the past. Certainly, such a demonstration could be helpful, but it is not required. In this case, we

address the issue of a nexus between Mr. Chavis's law school test accommodations and the UBE solely because of the conclusion reached by ARC.

In addressing the matter, we "give[] considerable weight to" the circumstance that Mr. Chavis was given test accommodation by two law schools, and that the UBE and law school exams involve "similar testing situations[.]" 28 C.F.R. § 36.309(b)(1)(v). Generally, both types of examination are hours-long, strictly-timed, intensive written examinations on various legal topics, and are comprised of multiple-choice questions, prompts for essays, and/or similar assignments. See National Conference of Bar Examiners, <u>Multistate Essay Examination</u>, <u>Multistate Performance Test</u>, <u>Multistate Bar Examination</u>, https://www.ncbex.org/exams/mee [https://perma.cc/YBE9-VDXT]; https://www.ncbex.org/exams/mpt [https://perma.cc/3KBU-YWZR]; https://www.ncbex.org/exams/mbe [https://perma.cc/22M3-UYGN]; Jane Bloom Grisé, <u>Question #1: Is There a Gender Gap in Performance on Multiple Choice Exams? A. Always B. Never C. Most of the Time</u>, 43 Women's Rts. L. Rep. 140, 204 (2021) ("[L]aw school exams often mimic the UBE's structure." (Cleaned up)). Given the nature of Mr. Chavis's disability and the similarities between the UBE and law school exams, although not required to be shown, we conclude that there is a "nexus" between Mr. Chavis's test accommodations in law school and the test accommodation that he requested for the UBE. Based on the nature of the tests, it is logical that there would be a link between the need for law school test accommodations and UBE accommodations. And it makes sense to give considerable weight to Mr. Chavis's test accommodations in law school, given that, as we pointed out at the show cause hearing, law schools are presumably concerned about fairness to all

students, and, thus, there is no reason to believe that law schools grant test accommodation requests arbitrarily.

To be clear, however, we do not view Mr. Chavis's test accommodations in law school as dispositive of the reasonableness and necessity of a similar test accommodation as to the UBE. We decline the invitation to adopt as a rule for assessing test accommodation requests the DOJ's guidance that "[p]roof of past testing accommodations in similar test settings is generally sufficient to support a request for the same testing accommodations for a current standardized exam or other high-stakes test." ADA Requirements: Testing Accommodations, supra. As SBLE's counsel pointed out at the show cause hearing, this guidance is exactly that—guidance, not a regulation or other type of law that binds us. That said, we are persuaded that proof of test accommodations in law school generally should be given considerable weight in determining whether the same test accommodations are warranted for the bar examination. But given that the question of whether an accommodation would be reasonable—and thus required under the ADA—is an individualized, fact-specific, case-by-case inquiry, such proof alone would not be dispositive. See Dunlap, 878 F.3d at 799. In short, test accommodations given in law school are certainly relevant to a test accommodation request as to the UBE, and, under 28 C.F.R. § 36.309(b)(1)(v), must be "give[n] considerable weight[.]"

At the show cause hearing, SBLE's counsel stated that SBLE "should give deference to prior accommodations[,]" and asserted that, in this case, SBLE did so, in compliance with 28 C.F.R. § 36.309, but nonetheless determined that Mr. Chavis's request should be denied. The record, though, does not seem to confirm the idea that deference or

any particular weight was accorded to the circumstance that Mr. Chavis had been granted test accommodations by two law schools. In its letter denying Mr. Chavis's test accommodation request, SBLE did not mention his test accommodations in law school beyond stating that SBLE received the "supporting documentation" attached to his test accommodation request. Similarly, in his report, Dr. Lewandowski did not mention Mr. Chavis's test accommodations in law school beyond stating that the documents to support the test accommodation request included "[c]ertification of test accommodations" from the law schools and that Mr. Chavis evidently "never requested test accommodations until law school." And, in the Hearing Report, the ARC did not mention Mr. Chavis's test accommodations in law school beyond identifying documentation of the accommodations in a list of the fifteen exhibits that the ARC added to the record during the hearing and stating that Mr. Chavis "failed to call any witnesses or produce documentary evidence to show the nexus as to how any prior accommodations received by [him] have bearing on his request for specific accommodations to the" UBE. On this record, it is not clear that the ARC, SBLE, and Dr. Lewandowski gave "considerable weight to" Mr. Chavis's test accommodations in law school, as required under 28 C.F.R. § 36.309(b)(1)(v) and as we do.

That said, although we take issue with Dr. Lewandowski's opinions in this case, we see no basis to conclude that, in general, SBLE's referrals to Dr. Lewandowski pursuant to Board Rule 3(c)(2) have disproportionately negatively impacted any group of individuals who have requested test accommodations for the Maryland bar examination. In other words, we are unpersuaded by Mr. Chavis's contentions that Dr. Lewandowski's

- 43 -

"skepticism of accommodations first granted in college and law school is well-known" and that his alleged skepticism disproportionately impacts applicants who are low-income, first-generation immigrants, and/or not white. Kimmer, 392 Md. at 257, 896 A.2d at 1010, and K.E., 471 Md. at 90, 238 A.3d at 278, are the only reported opinion and order of which we are aware—in Maryland or elsewhere—involving test accommodation requests that Dr. Lewandowski reviewed. So, including this case, there is a sample size of three, which is not enough to draw any reasonable inferences regarding Dr. Lewandowski's alleged skepticism of accommodations requests or the alleged impact of his work. It is also worth noting that our opinion in Kimmer and our order in K.E. do not reveal the income level, family history, or race of either applicant, which further underscores the lack of evidence of bias on Dr. Lewandowski's part.

Nonetheless, our opinion in Kimmer, 392 Md. at 257, 896 A.2d at 1010, demonstrates that SBLE started referring test accommodation requests to Dr. Lewandowski at least eighteen years ago, in or before 2005. It is possible that consulting with other experts about test accommodation requests could provide SBLE with a wider range of perspectives than it would have been able to consider otherwise. So, going forward, SBLE may wish to consider using additional experts to evaluate test accommodation requests—*i.e.*, to cast a wider net when making referrals under Board Rule 3(c)(2).

Finally, we note that, at the show cause hearing, SBLE's counsel repeatedly brought to our attention alleged concessions by Mr. Chavis at the hearing before the ARC and argued that the ARC's recommendation should be implemented on the ground that Mr.

Chavis conceded that he was not impaired in any function required for the UBE. At the ARC hearing, during Mr. Chavis's cross-examination, SBLE's counsel quoted portions of Dr. Lewandowski's report and asked Mr. Chavis whether he agreed with the doctor's findings. Mr. Chavis repeatedly responded in the affirmative before replying to a question by asking: "[A]re you asking me if I agree that the statement that you said is true regarding me, or are you asking me that I agree because it's on the paper?" SBLE's counsel stated: "To be clear, I'm not asking you if I'm reading the statement correctly. I'm asking you if you agree or otherwise disagree with the statement that Dr. Lewandowski makes in his reports here; do you understand that?" Mr. Chavis responded: "Yeah. I agree that he makes those statements, yes." SBLE's counsel stated: "Well, no, no. Not that he's made the statements, not that those words are written on this page. I'm asking you if you agree with the conclusions that are drawn here in these sentences that I'm bringing to your attention." SBLE's counsel asked Mr. Chavis whether he understood SBLE's counsel's previous questions that way, and Mr. Chavis responded in the negative. SBLE's counsel quoted the portions of Dr. Lewandowski's report that he had already quoted, as well as additional ones, and asked Mr. Chavis whether he agreed. One such question was: "'There is no demonstration of impairment in attention, processing speed, reading, writing, or any other function required on the Bar exam.' Do you agree with the conclusion reached by Dr. Lewandowski in that sentence, sir?" Mr. Chavis responded to each such question in the affirmative.

Given the back-and-forth nature of the questioning, we do not agree that Mr. Chavis's responses were necessarily concessions. As this Court pointed out during the

show cause hearing, given that Mr. Chavis consistently contended before the ARC that he needs test accommodations, it would not be fair to view his responses to SBLE's counsel's questions on cross-examination as concessions that he lacks an impairment for which a test accommodation would be warranted. In addition, Mr. Chavis's alleged concessions were not among the stated bases for the ARC's recommendation to uphold SBLE's denial of his request for a test accommodation.

When he made these alleged concessions, Mr. Chavis was a self-represented applicant giving answers, under oath, to leading questions being asked during his cross-examination. Mr. Chavis expressed confusion regarding SBLE's counsel's questions, and, from Mr. Chavis's perspective, he may have believed that his testimony amounted to nothing more than looking at Dr. Lewandowski's report and confirming that he agreed that Dr. Lewandowski had expressed certain opinions. Under these circumstances, we decline SBLE's invitation to uphold the ARC's recommendation based on alleged concessions by Mr. Chavis.

For the above reasons, we sustain Mr. Chavis's exceptions to the ARC's recommendation, reverse SBLE's denial of Mr. Chavis's test accommodation request, and remand to SBLE with instruction to grant that request.

**IT IS SO ORDERED. STATE BOARD OF LAW EXAMINERS TO PAY COSTS.**

- 46 -

Argued: October 2, 2023

IN THE SUPREME COURT

OF MARYLAND

Misc. No. 65

September Term, 2022

IN THE MATTER OF ANTAVIS CHAVIS

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

Dissenting Opinion by Booth, J., which Fader,
C.J. and Gould, J., join.

Filed:  December 21, 2023

Respectfully, I dissent.

In this case, Mr. Chavis seeks a test accommodation under the Americans with Disabilities Act ("ADA") on the basis of Attention-Deficit/Hyperactivity Disorder ("ADHD"). According to the Center for Disease Control and Prevention ("CDC"), "ADHD is one of the most common neurodevelopmental disorders of childhood. It is usually first diagnosed in childhood and often lasts into adulthood." Center for Disease Control and Prevention, *What is ADHD?, available at* https://perma.cc/2DQW-TP75. A healthcare provider diagnoses ADHD by using guidelines in the American Psychiatric Association's Diagnostic and Statistical Manual, Fifth Edition ("DSM-5").[1] Center for Disease Control and Prevention, *Symptoms and Diagnosis of ADHD*, *available at* https://perma.cc/J5HW-ZDXA. "This diagnostic standard helps ensure that people are appropriately diagnosed and treated for ADHD." *Id.* "Using the same standard across communities can also help determine how many children have ADHD, and how public health is impacted by this condition." *Id.*

---

[1] The current DSM guidelines for ADHD are set forth in the American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (2013). The Southern University Law Center Form refers to the prior edition of the DSM guidelines—the DSM-IV. According to the National Institute of Health, the DSM-5 revisions include modifications to each of the ADHD diagnostic criteria, but do not modify the "core ADHD symptom domains." Jeffery N. Epstein & Richard E.A. Loren, *Changes in the Definition of ADHD in DSM-5: Subtle But Important*, 2013 Neuropsychiatry (London) 1, 2 (2013). One notable difference is that the "age of onset" criterion changed from requiring that some hyperactive-impulsive or inattentive symptoms be present before the age of seven in the DSM-IV to requiring that such symptoms be present prior to the age of twelve in the DSM-5. *Id.* at 1. In other words, under the DSM-5, there must be a manifestation of ADHD symptoms before the age of twelve.

Where ADHD is diagnosed in an adult, the physician applies the clinical guidelines for a diagnosis of ADHD as provided in the DSM-5. *Id.* "During an evaluation, the clinician will try to determine the extent to which these symptoms currently apply to the adult and if they have been present in childhood." Children and Adults with Attention-Deficit/Hyperactivity Disorder, *Diagnosis of ADHD in Adults*, *available at* https://perma.cc/VW7Z-CEZE. In making the diagnosis, the guidelines provide that "adults should have at least five of the [DSM-5] symptoms present." *Id.*[2]

A healthcare provider makes an ADHD diagnosis based on the number and severity of the symptoms, the duration of the symptoms, and the degree to which these symptoms cause impairment in various areas of life, such as home, school or work, with friends or relatives, or in other activities. *Id.* As the National Resource Center on ADHD[3] explains,

> [a]lthough there is no single medical, physical, or genetic test for ADHD, a diagnostic evaluation can be provided by a qualified mental health care

---

[2] The DSM-5 lists three presentations of ADHD—Predominantly Inattentive, Hyperactive-Impulsive, and Combined. Children and Adults with Attention-Deficit/Hyperactivity Disorder, *Diagnosis of ADHD in Adults*, *available at* https://perma.cc/VW7Z-CEZE. For Predominantly Inattentive ADHD—the diagnosis that Mr. Chavis has presented in this case—the DSM-5 identifies the following symptoms: failure to give close attention to details or makes careless mistakes; difficulty sustaining attention; struggling to follow through with instructions; difficulty with organization; avoids or dislikes tasks requiring sustained mental effort, loses things; is easily distracted; is forgetful in daily activities. *Id.*

[3] As the Children and Adults with Attention-Deficit/Hyperactivity Disorder's ("CHADD") website states, "[t]he National Resource Center on ADHD (NRC), a program of CHADD, was established to be the national clearinghouse for the latest evidence-based information on ADHD. It is primarily funded through a cooperative agreement with the Centers for Disease Control and Prevention (CDC) [and the] National Center on Birth Defects and Developmental Disabilities (NCBDDD)." Children and Adults with Attention-Deficit/Hyperactivity Disorder, *About the National Resource Center*, *available at* https://perma.cc/6SZV-JUJB.

professional or physician who gathers information from multiple sources. These sources include ADHD symptom checklists, standardized behavior rating scales, a detailed history of past and current functioning, and information obtained from family members or significant others who know the person well. Some practitioners will also conduct tests of cognitive ability and academic achievement in order to rule out a possible learning disability. ADHD cannot be diagnosed accurately just from brief office observations or simply by talking to the person. The person may not always exhibit the symptoms of ADHD during the office visit, and the diagnostician needs to take a thorough history of the individual's life. A diagnosis of ADHD must include consideration of the possible presence of co-occurring conditions.

*Id.*

As the National Resource Center on ADHD further explains,

Although different clinicians will vary somewhat in their procedures and testing materials, certain protocols are considered essential for a comprehensive evaluation. These include a thorough diagnostic interview, information from independent sources such as the spouse or other family members, DSM-5 symptom checklists, standardized behavior rating scales for ADHD and other types of psychometric testing as deemed necessary by the clinician.

*Id.*

# I

## Procedural History and Facts

As noted by the Majority, Mr. Chavis requested test accommodations pursuant to the ADA from Maryland's State Board of Law Examiners ("SBLE") in connection with Maryland's administration of the July 2023 Uniform Bar Examination ("UBE"). He requested the accommodation of additional testing time, "preferably 50% additional time," and relied upon ADHD as the basis for his disability. On the Accommodations Request Form that he signed on March 27, 2023, Mr. Chavis stated that he has "issues with focus" and that it takes him "a significant amount of time to complete a task." In support of his

3

request, Mr. Chavis submitted: (1) his academic transcripts for Chowan University, where he obtained his undergraduate degree, and for Southern University Law Center, where he obtained his juris doctorate degree; (2) his Law School Admission Test ("LSAT") and Multistate Professional Responsibility Exam ("MPRE") scores; (3) a Treatment Plan from Allstar Community Care bearing a date of August 10, 2022 ("Allstar Plan"); (4) an ADHD Verification Form supplied by Southern University Law Center that was completed by Jeffrey Thiebaud, M.D. and dated August 26, 2022 ("Southern University Verification Form" or "Verification Form"); and (5) certifications of test accommodations from Southern University Law Center and The University of the District of Columbia David A. Clarke School of Law ("UDC Law").

### A. *Mr. Chavis's Documentation Submitted to Support His Request for ADA Test Accommodations*

#### 1. *The Allstar Plan*

The Allstar Plan is a computer-generated document that was prepared by Allstar Community Care, LLC, located in Baton Rouge, Louisiana, which provides, among other things, behavioral health services. The Allstar Plan was prepared for Mr. Chavis and is dated August 10, 2022. It is unsigned and does not reflect the identity of any treatment professional. As Lawrence Lewandowski, Ph.D.,[4] a licensed psychologist retained by

---

[4] Dr. Lewandowski's curriculum vitae was admitted into evidence before the Accommodations Review Committee ("ARC"). He specializes in school psychology and clinical psychology and received his B.A. in psychology from Northwestern University, his M.A. in psychology from the University of Michigan, and his Ph.D. in educational psychology from the University of Michigan. In addition to serving as a consultant to Maryland's State Board of Law Examiners ("SBLE"), Dr. Lewandowski is also a consultant

SBLE to evaluate accommodation requests, explained, the Allstar Plan "assumes [Mr. Chavis] has ADHD," but "it does not provide any test data to corroborate the diagnosis, nor does it provide any objective evidence of a substantial limitation in any major life activity." Notably, the Allstar Plan states that Mr. Chavis "*needs to be assessed for ADHD, likely not diagnosed in his early years due to the athleticism program.*" (Emphasis added).

### 2. The Southern University Verification Form

Dr. Thiebaud, a physician in Louisiana, filled out the Southern University Verification Form in connection with Mr. Chavis's request for an accommodation in August 2022 as he was entering his last year of law school. This form contained detailed instructions, excerpts of which are reproduced below given that they have a bearing on my analysis:

> **Notice:** This form must be completed by a licensed psychiatrist or licensed psychologist qualified to diagnose and treat adult Attention-Deficit/Hyperactivity Disorder ("ADHD"). The evaluator *must fill out this entire form* which provides a summary of a comprehensive evaluation which must be attached.
>
> * * *
>
> *A diagnosis of ADHD must be supported by a comprehensive evaluation conducted within the last three (3) years. Neuropsychological/psychoeducational evaluation is often necessary for differential diagnosis and should be included as part of the evaluation.*
>
> The information collected by the evaluator contained in the report *must consist of more than self-report by the applicant.* The evaluator is expected to review and discuss DSM-IV Diagnostic Criteria for ADHD (currently and retroactively) and describe in detail the extent to which the applicant meets these criteria. The report must include a specific ADHD diagnosis based on the DSM-IV criteria. A *thorough diagnostic summary based on a comprehensive*

---

for the Boards of Law Examiners in the following jurisdictions: New York, Texas, Colorado, Delaware, Pennsylvania, Minnesota, Missouri, Massachusetts, Connecticut, Hawaii, and North Carolina. He is also a consultant for the National Board of Medical Examiners, the Law School Admission Council, and various other school districts.

*evaluation process is a necessary component of this application. This summary must include*: (1) a demonstration of the evaluators having ruled out alternative explanations for inattentiveness, impulsivity, and/or hyperactivity as a result of psychological and medical disorders for noncognitive factors; (2) indication of how patterns of inattentiveness, impulsivity and/or hyperactivity across the lifespan and across the settings are used to determine the presence of ADHD; (3) indication of the substantial limitation of learning presented by ADHD and the degree to which it impacts the individual in the context for which accommodations are being requested; and (4) an individuation as to why specific accommodations are needed and how the effects of ADHD symptoms are ameliorated by the accomplishments.

(Emphasis added).

Although Dr. Thiebaud provided some handwritten responses to the requested information on the Verification Form, his responses are brief and incomplete. Dr. Thiebaud's responses to some of the key questions printed on the Verification Form are as follows. The printed form asked: "When was the applicant first diagnosed with ADHD?" Dr. Thiebaud wrote "At 8 years of age." In response to the printed question whether he made the diagnosis, he checked the box "no." In response to the question asking for a description of the applicant's current ADHD symptoms, he wrote: "poor attention and focus[,]" "takes longer to complete tasks[,]" and "often will not complete tasks due to distraction." The printed form contains a check-the-box answer to the question: "Does the applicant meet full DSM-IV criteria for: ADHD inattentive type?" Dr. Thiebaud checked the box "yes." In response to the printed check-the-box question whether the "applicant ha[s] a documented history of childhood ADHD[,]" Dr. Thiebaud checked the "yes" box. In response to the question "What evidence was presented to indicate impairment from ADHD symptoms with non-academic environments[,]" Dr. Thiebaud wrote: "Difficulty completing general home tasks, and at work. Often leaves tasks undone."

6

Question 9 on the Verification Form asked: "Has formal cognitive and/or psychological testing been administered to the applicant?" Dr. Thiebaud checked the "yes" box. Question 10 states, "*If you answered 'yes' to the preceding question, attach a complete copy of the report, including test scores. If you answered 'no' explain why testing was not deemed necessary to rule out comorbid problems/alternative explanations for ADHD symptoms.*" (Emphasis added). Notably, no copy of any testing or report was attached to the Verification Form, and the space for a response to question 10 was left blank.

Question 14 asked: "What evidence has been reviewed to indicate that ADHD symptoms cause the applicant difficulty taking tests?" Dr. Thiebaud's four-word response was "personal experience and neuropsychiatric testing." As noted, no documented testing was attached.

Question 15 asked: "What evidence has been reviewed to indicate that the requested accommodations ameliorate ADHD symptoms during tests?" Dr. Thiebaud's response was "Inattentive type typically responds well to accommodations. Previously benefitted while in grade school."

After providing a basic description of the testing conditions and environment at Southern University Law Center, the Verification Form asked:

> what *specific testing accommodation(s) do you recommend* for the applicant, *including a detailed explanation of why the accommodation(s) is needed* and how it will reduce the impact of functional limitation(s).

(Emphasis added). Dr. Thiebaud wrote: "He has diagnosed ADHD and will be adversely affected if not given additional time. Please give additional time to complete exams and isolated testing environment to limit distractions, if possible."

7

At the bottom of the Form, under the section titled "**Required Documentation and**

**Verification,**" the form required the licensed professional to certify the following:

> *I have attached to this form copies of all records in my possession, custody, or control on which I have relied in completing this form.* I understand that the applicant authorized the release of these records and *understand that the request for accommodations will not be processed without these records.* I further acknowledge that the applicant consents to my discussing this form or the attached documents with representative(s) of Southern University of Law Center.

(Emphasis added). Dr. Thiebaud signed the form on August 26, 2022, but the record does not

reflect that he attached any documents or records. Southern University Law Center granted a

disability accommodation on September 6, 2022 for "[e]xtended time on exams and quizzes

(50%)" and a "[l]ow distraction testing room[.]" When Mr. Chavis attended UDC Law for the

Spring 2023 semester, he was granted similar accommodations, and it appears that the basis

for doing so was the accommodation granted by Southern University Law Center.[5]

### B.    SBLE's Review of Mr. Chavis's Request

Following an initial review of Mr. Chavis's request for ADA Test Accommodations,

SBLE referred Mr. Chavis's request and supporting documentation to its expert, Dr.

Lewandowski. Dr. Lewandowski submitted a written report, which is part of the record in

this case. After reviewing the documentation, Dr. Lewandowski noted that:

> There are no childhood records in the current file. The ADHD verification form was completed by Jeffrey Thiebaud, M.D. It does not mention if Dr. Thiebaud completed tests of attention, intelligence, reading, writing, or other functions needed to perform the Bar exam. There is no information on the form regarding data-based evidence of ADHD. The form mentions that ADHD was diagnosed

---

[5] There is nothing in the record to reflect that UDC Law requested any more documentation for Mr. Chavis's participation in a semester program at that University other than the certification of accommodation from Southern University Law Center.

at age 8, yet there is no report or information describing how that diagnosis was determined. *Essentially, there is no evaluation evidence regarding the ADHD diagnosis in the entire file.* Dr. Thiebaud states that [Mr. Chavis] has poor attention and focus, and he will not complete tasks due to distraction. The doctor provided no evidence to support these assertions. *It appears that Dr. Thiebaud may be paraphrasing complaints made by [Mr. Chavis].*

If [Mr. Chavis] had a diagnosis of ADHD since age 8, then there should be medical, psychological, and/or educational records of this condition, and there should be evidence of special services such as test accommodations. However, there are no K-12 school records in the file, and no evidence of ADHD or impairment in functioning. Apparently, [Mr. Chavis] never requested test accommodations until law school. The file contains LSAT and MPRE test scores obtained without test accommodations. The scores are modest, but they cannot be readily interpreted without information regarding intelligence levels, attention capacity, processing speed, and reading and writing skills. *Unlike most applicants for test accommodations, the current file contains no information regarding these functions or other test taking behaviors.*

The only clinical document in the file is a treatment plan from Allstar Community Care. While this plan assumes [Mr. Chavis] has ADHD, it does not provide any test data to corroborate the diagnosis, nor does it provide any objective evidence of a substantial limitation in a major life activity. Essentially, the limited documentation in the file nibbles around the edges of an ADHD diagnosis without providing any objective assessment of the disorder, and it provides no evidence of functional limitations. Interestingly, the treatment plan discusses ways to manage problems of attention and anxiety, but never mentions anything about test taking or test accommodations.

There are essentially two criteria that agencies require to qualify for test accommodations. First, an individual needs to have an evidence-based diagnosis of a mental or physical disorder from a qualified professional. And second, the individual must demonstrate that the disorder substantially limits them in a major life activity as compared to most people. The current documentation shows some support for the ADHD diagnosis, although there are no objective data to prove the validity of the diagnosis. I certainly cannot confirm the diagnosis based on the little information in this file. More importantly, the second criterion is not addressed by the current documentation. There is no documentation of impairment in attention, processing speed, reading, writing, or any other function required on the Bar exam. Consequently, [Mr. Chavis] does not qualify for test accommodations. [Mr. Chavis] might want to consider what most applicants do for their applications, obtain a

comprehensive psychoeducational evaluation that provides objective evidence of functional limitations.

(Emphasis added).

After receiving Dr. Lewandowski's report, SBLE sent a letter to Mr. Chavis denying his request for test accommodations on Maryland's administration of the July 2023 UBE. In denying the request, SBLE noted the "absence of objective data to prove the ADHD diagnosis and establish impairment in a major life activity as compared to most people," and therefore determined that Mr. Chavis did "not qualify for extended testing time not available to other examinees."

### C.   Mr. Chavis's Appeal to the Accommodations Review Committee

Mr. Chavis filed an appeal of the denial of his request for a test accommodation to the Accommodations Review Committee ("ARC"). The ARC held a hearing on July 12, 2023. The ARC heard testimony from Mr. Chavis and Dr. Lewandowski. Mr. Chavis did not provide any other evidence or documentation in support of his request. He confirmed that Dr. Thiebaud did not have any documentation in his file reflecting a diagnosis when he was 8 years old, and that he began receiving accommodations when he was in his last year of law school after Dr. Thiebaud completed and submitted the Verification Form. He testified that Dr. Thiebaud had spoken to his psychiatrist at Allstar and "they completed the form." When asked who the psychiatrist was, Mr. Chavis stated that she works at Allstar and that he could provide the name.[6] He acknowledged that he did not have accommodations when he took the LSAT or the MPRE examination. He confirmed that

---

[6] The record does not reflect that the psychiatrist's name was provided.

10

no psychological test results had been provided to SBLE as part of his accommodations request.

After being qualified as an expert, Dr. Lewandowski testified about the two criteria that agencies require for test accommodations. He noted that the first criterion is that a "person has a diagnosed disorder from a qualified professional. And ideally, there should be some evidence for that, that it's not based on the self-report of the person himself. And then, secondly, that there's a demonstration of functional impairment. And in this case, that would restrict access to the exam."

In response to questioning by counsel with respect to the types of evidence or documentation that bar candidates generally submit to establish both the diagnosis prong and the substantial limitation prong, Dr. Lewandowski testified that the applicant typically produces some type of objective data that is measurable. He also provided examples of the types of documentation typically presented. He stated that the "lion's share of individuals with ADHD, since it's a neurodevelopmental disorder, have childhood evidence." Dr. Lewandowski stated that "Mr. Chavis explained the rationale as to why that didn't happen in this case, which, okay, is understandable." After explaining the type of documentation that he typically reviews, he stated:

> And I would say the majority [of applicants] have psychological evaluations in which they've been tested. So we have a sense of their intelligence level, their memory capabilities, their processing speed, their reading, their writing. And in ADHD cases they usually measure attention, sustained attention, vigilance, reaction time attention, auditory visual attention, things like that. So all these things are measurable. So typically, you know, these days people get those functions measured, and they show whether a person is average, normal in those areas, or impaired.

11

Dr. Lewandowski explained why an objective measurement is relevant to the Bar examination, stating: "the bar exam is an objective measure of, you know, your legal knowledge. These are objective measures of how well you read, how well you comprehend, how well you write, how well you attend, how well do you think, et cetera."

Turning to Mr. Chavis's application, Dr. Lewandowski testified that, "even after listening to Mr. Chavis, I still feel like we don't have concrete, confirmed evidence from a qualified professional. We certainly don't have evaluation evidence." He noted that the Allstar Plan "mention[s] ADHD[,]" but "they never actually say it's a diagnosis." He stated that "it's not signed by anyone. So there's not a professional attached. There's no psychiatrist, psychologist, there's no signature, professional signature. So it's really kind of hard to follow." With respect to the Southern University Verification Form that Dr. Thiebaud filled out, Dr. Lewandowski stated that "Mr. Chavis obviously talked to him or talked to someone and told him there are symptoms. . . . And that's kind of, I think maybe how a diagnosis was arrived at. So I assume that there is a diagnosis. And I kind of assumed that in my report, although it's hard to confirm. There's certainly no objective evidence of ADHD." Dr. Lewandowski summarized his interpretation of the documents as follows:

> The Allstar report, again, its unsigned. There's no evaluation of ADHD. There are just mentions of ADHD, as if he had the diagnosis. But there's no real diagnostic or assessment process, if you will.
>
> The document from Dr. Thiebaud says there was neuropsychiatric testing. That would be great, but I don't see any. I didn't see any. I think I noted that in my report. If there was a report at age eight, I'd love to see it. And that is kind of what I was saying in that report. You know, there's indications and maybe things happened, but we're not seeing it. And I've got to go by evidence of, you know, I'm looking, in my role, at objective evidence, not hearsay or reports of things happening. I'm looking for evidence that it did happen.

12

Dr. Lewandowski stated that there are "lots of tests" for ADHD, and noted that Mr. Chavis's professionals at Allstar "recommended an assessment, but they didn't do any assessment[,]" which, in his view, "was unfortunate." Dr. Lewandowski stated that Mr. Chavis's application is "missing pieces[,]" stating that "[t]he evidence that he has ADHD, and that he has impaired attention, and that it affects his ability to complete a task, it's all measurable, it's all demonstrable if somebody bothered to take the time to do it. We just don't have evidence of it."

After considering all the evidence and testimony presented, the ARC concluded that Mr. Chavis had not demonstrated his eligibility for reasonable accommodations under the ADA. The ARC determined that "there was no showing by Petitioner of any diagnostic or any data-based evidence related to Petitioner's assertion of ADHD." The ARC further stated that "no objective evidence or testimony was presented by the Petitioner related to a showing of substantial limitation in any major life activity, nor how there were limitations regarding functions required on the Maryland Bar Exam." The ARC concluded that it was

> persuaded by the lack of information in the record and testimony to support the requested test accommodation. Even presuming [Mr. Chavis] meets the legal definition of disability, which could be the case, he does not seems to have met the second criterion of the legal standard . . . . The Record does not show the required nexus between the alleged disability and the reasonable accommodations he may or may not have received. The basis for this decision was the weight of evidence from Dr. Lewandowski and his assessment that there was insufficient evidence to show an impairment that warranted accommodation under the Americans with Disabilities Act.

Thereafter, Mr. Chavis filed exceptions to this Court.

## II

In analyzing Mr. Chavis's exceptions, it is useful to provide some context for the type of accommodation that Mr. Chavis is seeking.

The regulation of the practice of law, including the regulation of admission to the bar, has long been a judicial function. *In re Kimmer*, 392 Md. 251, 263–64 (2006). This Court is the ultimate authority charged with overseeing the practice of law in Maryland. An applicant seeking admission to the Maryland Bar must take and pass the bar examination.

### A.    *SBLE's Authority to Administer the Bar Exam*

This Court has established SBLE pursuant to Maryland Code, Business Occupations Article, § 10-101, *et. seq.* and Maryland Rule 19-102. The Court has granted SBLE[7] authority to oversee the administrative procedures related to admission to the practice of law in Maryland, as those duties are assigned by rule, *see* Md. Rule 19-102(c)(1), including the authority to adopt rules to carry out the requirements of Chapter 100 and 200 of Rule 19, *see id.* 19-102(c)(2). As part of these administrative responsibilities, SBLE must schedule and administer a bar examination in Maryland twice a year, once in February and again in July. Md. Rule 19-203(b). "The purpose of the bar examination is to enable applicants to demonstrate their capacity to achieve mastery of foundational legal doctrines, proficiency in fundamental legal skills, and competence in applying both to solve legal problems consistent with the highest ethical standards." *Id.* 19-203(c). Although the number of applicants vary from year to year, it is safe to say that over 1,000 applicants take

---

[7] SBLE consists of seven members appointed by the Court. Each member must be an attorney admitted and in good standing to practice law in Maryland. Maryland Rule 19-102(a).

14

the examination annually.  These statistics are available on this Court's website, as are the pass/fail rate statistics for each administration of the exam.  In July 2023, 808 examinees took the exam, and the overall pass rate was 59%.

### B.     *Maryland's Adoption of a Uniform and Portable Bar Examination – UBE and NextGen*

In July 2019, this Court adopted the UBE after a year-long study.  The UBE is a standardized bar exam created by the National Conference of Bar Examiners ("NCBE"). It is designed to test knowledge and skills that every lawyer should have before becoming licensed to practice law.  The UBE consists of three parts: the Multistate Bar Examination ("MBE"), the Multistate Essay Examination ("MEE"), and the Multistate Performance Test ("MPT").  It is administered twice a year over the course of two days.

The UBE is uniformly administered and scored, and is portable, which means that it can be used to apply in multiple jurisdictions that have adopted the UBE.  Currently, there are a total of 41 jurisdictions (39 states, the District of Columbia, and the U.S. Virgin Islands) that have adopted the UBE.  In other words, although SBLE administers the UBE in Maryland, it is a uniform test that is administered across all of the jurisdictions that have adopted it.  For example, an examinee can take the UBE in Maryland and transfer the score to the District of Columbia in order to gain admission to practice law there.

According to the statistics maintained by SBLE,[8] applicants are taking advantage of the portability offered by the UBE and are transferring their UBE scores from other jurisdictions

---

[8] The statistics described in this paragraph are available at https://perma.cc/YU4A-HFVH.

to obtain admission to the Maryland Bar, and vice versa. Between July 2019 and July 2023, SBLE has confirmed 781 UBE transfer applications for admission in Maryland from another jurisdiction, with another 174 UBE transfer applications in process at SBLE as of July 1, 2023. From July 1, 2019 to January 1, 2023, 926 applicants who took the UBE in Maryland transferred their scores to other UBE jurisdictions. All told, nearly 1,900 Maryland bar applicants have availed themselves of the score portability benefits of the UBE.

This Court recently issued an Administrative Order adopting the NextGen Bar Exam, which is currently being developed by the NCBE and will be administered in July 2026.[9] The NextGen Bar Exam will replace the current UBE as the sole basis for score portability between UBE jurisdictions. In adopting the NextGen Bar Exam, this Court acknowledged that it has "an interest in remaining a UBE jurisdiction where successful takers of a nationally administered Bar Examination may avail themselves of score portability[.]" In other words, this Court has recognized that portability is important in Maryland, and the portability aspect of the Maryland Bar Exam will continue going forward as NCBE transitions to the NextGen Bar Exam.

### C.   The MPRE – Another Uniform Test Required for Admission to the Maryland Bar

In addition to the UBE, each applicant seeking admission to the Maryland Bar must pass the MPRE, which is a two-hour, 60-question multiple choice examination that is

---

[9] *Available at* https://perma.cc/FA4E-58UQ. As of the date of this opinion, in addition to Maryland, Missouri, Oregon, Wyoming, and Connecticut have announced their adoption of the NextGen Bar Exam. As the UBE is phased out, it is anticipated that those jurisdictions that adopted the UBE will transition to the NextGen Bar Exam to maintain portability of the bar examination score.

16

administered three times per year. It is developed and administered by the NCBE. This examination is required for admission to the bars of all jurisdictions in the United States, with the exception of Wisconsin and Puerto Rico. Applicants seeking a test accommodation for the MPRE must submit an application to the NCBE to be approved by that organization. The NCBE has adopted specific guidelines to address the necessary documentation required for a testing accommodation based upon an ADHD diagnosis. *See* National Conference of Bar Examiners, *Guidelines for Medical Documentation When an Accommodation Request is Based Upon a Diagnosis of ADHD* ("NCBE ADHD Guidelines"), *available at* https://perma.cc/53DK-NME9. Given that a successful candidate for the Maryland Bar must also pass the MPRE—a test that is administered by the NCBE—it is instructive to examine the documentation required by the NCBE in order to obtain an ADHD test accommodation.

*NCBE's Guidelines Promulgated for ADHD Accommodations for the MPRE*

According to the NCBE ADHD Guidelines, the NCBE "is committed to providing reasonable and appropriate accommodations to candidates with documented disabilities, in accordance with the [ADA]." For a disability testing accommodation based upon ADHD, the NCBE ADHD Guidelines *require that the applicant provide* a *diagnosis*, which must be performed by a qualified professional having the "appropriate training and relevant experience in the differential diagnosis of ADHD." (Emphasis added). The NCBE ADHD Guidelines state:

> *A diagnosis must be provided*, along with evidence of a substantial limitation in one or more major life activities that affect the applicant's ability to take the MPRE under standard conditions. The documentation must validate the

17

need for accommodations based upon the applicant's current level of functioning.

ADHD diagnoses should *ordinarily be provided by way of a comprehensive report that reflects a thorough interview of the applicant and the use of appropriate diagnostic instruments and aids.*

(Emphasis added).

The NCBE ADHD Guidelines outline the topics that should be addressed in the documentation, including history of ADHD symptoms, developmental history, family history, academic performance history, review of any neuropsychological or psychoeducational test reports, or diagnoses found in other types of documentation, current symptoms, how long they have been present, and their impact in multiple settings. The NCBE ADHD Guidelines also state that the evaluator's report "must demonstrate the current impact of ADHD on the applicant's major life activities that affect his or her ability to take the MPRE under standard conditions." The NCBE ADHD Guidelines outline the types of specific information that should be included in the report, including

a specific diagnosis of ADHD (including the subtype or presentation) based on the DSM diagnostic criteria (DSM-IV-TR or DSM-5). *The qualified professional should provide a rationale and supportive data to substantiate the diagnosis.*

*It is not sufficient for a current evaluation to simply refer to a prior diagnosis as confirmatory evidence of ADHD. The current assessment needs to reconfirm the diagnosis with supportive clinical data.* Furthermore, a positive response to medication by itself does not constitute a proper basis for a diagnosis; nor does the use of medication in and of itself either support or negate the need for accommodation.

(Emphasis added). The Guidelines further explain that:

Because an ADHD diagnosis is based upon the integration of relevant historical information and other diagnostic findings by a qualified

18

professional applying his or her training and professional judgment, a thorough explanation and interpretation of findings is extremely helpful.

The Guidelines conclude with a "Summary of Information that Should be Included in ADHD Documentation" and provide a list of the types of documentation or objective data that should be included by the applicant.[10]

---

[10] Specifically, the NCBE's ADHD Guidelines provide the following list of the types of documentation that may accompany an ADHD testing accommodation request:

- A comprehensive diagnostic interview
- Objective historical and current information regarding the applicant's performance in testing and other academic contexts
- Relevant information drawn from third-party-sources
- A review of the DSM diagnostic criteria
- A neuropsychological, psychological, or psychoeducational assessment that elucidates current functional limitations caused by ADHD, including current levels of academic functioning in reading (decoding and comprehension) and processing measures that relate to the processing of visually presented words and sentences if the applicant's functioning in those areas is limited because of the ADHD
- Discussion of diagnostic instruments, check-lists, or other diagnostic aids used in the evaluation
- Age-based standard scores for all normed measures
- A specific diagnosis and a statement of severity
- A rule out of alternative diagnoses or explanations
- A discussion of whether medication has been tried as a method of treatment, its effectiveness, and residual symptomatology
- An interpretation and discussion of diagnostic findings
- A rationale for each recommended accommodation that is correlated with specific functional limitations established through the evaluation process from test results and clinical observations
- A discussion of whether accommodations have been used previously by the applicant in similar settings and, if so, the extent to which those accommodations met the applicant's needs

19

### D. *Maryland's Accommodations Review Committee*

As mentioned above, the NCBE administers the MPRE and is the entity that approves ADA accommodations for that test. By contrast, SBLE administers the UBE in Maryland and grants ADA accommodations for that test. An applicant whose request for a test accommodation pursuant to the ADA is denied in whole or in part by SBLE has the right to appeal to the ARC by filing a notice of appeal. Md. Rule 19-208. The ARC is created by rule and consists of nine members appointed by this Court. Md. Rule 19-208(a)(1). The Rule requires that six members of the ARC must be attorneys, and three members "shall be non-attorneys" who "shall be a licensed psychologist or physician[.]" *Id.*

Upon receipt of a notice of appeal, SBLE is required to transmit "a copy of the applicant's request for a test accommodation, all documentation submitted in support of the request, the report of each expert retained by [SBLE] to analyze the applicant's request, and the [SBLE's] letter denying the request[.]" Md. Rule 19-208(b)(2). The Chair of the ARC is required to "appoint a panel of the Committee, consisting of two attorneys and one-non attorney ["licensed psychologist or physician,"] to hold a hearing at which the applicant and [SBLE] have the right to present witnesses and documentary evidence and be represented by an attorney." *Id.* 19-208(b)(3). The hearing must be recorded. After the hearing, the panel is required to file with SBLE "a report containing its recommendation, the reasons for the recommendation, and *findings of fact* upon which the recommendation is based[.]" *Id.* 19-208(b)(4) (emphasis added). Thereafter, the panel transmits a copy of the report to the applicant and the Chair of the ARC. *Id.* Within 30 days after the panel files the report, the applicant or SBLE may file with the Chair exceptions to the

recommendations. *Id.* 19-208(c). Upon receiving the exceptions, the Chair is required to cause a transcript of the proceedings to be prepared and transmitted to this Court. *Id.* Proceedings in this Court "shall be on the record made before the panel." *Id.* 19-208(d). "The Court shall require the party who filed the exceptions to show cause why the exceptions should not be denied." *Id.* Notably absent from Rule 19-208 is the standard of review that this Court is to apply when considering exceptions to the ARC panel's findings of fact and recommendation. With this context in mind, I turn to the Majority's analysis in this case.

## III

### A.    *Standard of Review?*

As noted above, Rule 19-208 does not set forth the standard of review that this Court is to apply when considering exceptions filed in connection with an ADA accommodations recommendation. In a footnote, the Majority infers that it is applying a de novo standard of review because it contends Mr. Chavis's exceptions involve an interpretation of the ADA and is therefore purely a question of law. Maj. Slip Op. at 10 n.7.[11] I disagree that

---

[11] To support its de novo standard of review, the Majority quotes two inapposite federal cases interpreting the ADA—neither of which involve testing accommodations or consideration of whether an individual had established a disability under the ADA. Moreover, in neither case did the court apply a de novo standard of review to factual findings. In *Langer v. Kiser*, 57 F.4th 1085, 1100 (9th Cir. 2023), the Ninth Circuit reversed the district court's holding that the plaintiff did not establish an ADA violation in connection with a parking lot because the parking lot in question "was not a place of public accommodation." In reversing the district court, the Ninth Circuit stated that it was reviewing "the district court's findings of fact *for clear error* and its legal conclusion de novo." *Id.* (emphasis added). The court stated that it was reversing the "district court because its judgment rests on legal error and its factual finding that the parking lot was not

21

Mr. Chavis's exceptions to the ARC panel's findings of fact and recommendations are purely a matter of statutory interpretation of the ADA and therefore subject to a de novo standard of review.

In this case, Rule 19-208 requires that we undertake a review "on the record" of Mr. Chavis's exceptions to the ARC's "findings of fact" and recommendations. Under basic standards of review ordinarily applicable to administrative proceedings, this Court undertakes a de novo review of purely legal questions, such as matters of statutory interpretation. *Md. Dep't of the Env't v. Assateague Coastal Tr.*, 484 Md. 399, 450–51 (2023). However, when an administrative agency or board is charged by statute or rule with making first-level findings of fact, we apply a more deferential review, which we describe as determining whether the agency's findings are "clearly erroneous," "arbitrary or capricious," or "supported by substantial evidence." *Id.* at 447–50.[12]

To be sure, SBLE, and the ARC must determine, based upon the testimony and documents presented, whether the applicant has satisfied his or her burden of proving under the ADA that he or she has a disability that substantially impairs a major life activity. However, such an inquiry is not a purely legal question. Indeed, as the Majority concedes,

_____

open to the public is *clearly erroneous* in light of the business owner's testimony." *Id.* (emphasis added). In *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 904 (9th Cir. 2019), the court was asked to determine whether the ADA applied to a pizzeria's website and mobile application. The issue in that case involved a pure question of law.

[12] In undertaking its de novo review of this matter, the Majority focuses on Dr. Lewandowski's conclusions, instead of discussing the ARC panel's findings of fact. The Majority states that it does "not owe deference to" his opinions, and that "there is no authority indicating that his opinion would be entitled to any degree of deference or that it would be treated any differently than the way we would assess any other expert opinion." Maj. Slip Op. at 31.

22

this "is an individualized, fact-specific, case-by-case inquiry." Majority Slip Op. at 42 (quoting *Dunlap v. Liberty Na. Prods, Inc.*, 878 F.3d 794, 799 (9th Cir. 2017)); *see also Ware v. Wyoming Bd. of L. Examiners*, 973 F. Supp. 1339, 1357 (D. Wyo. 1997), *aff'd*, 161 F.3d 19 (10th Cir. 1998) ("Each testing agency has an independent duty under the ADA to determine reasonableness on a case-by-case basis."). And our Rule requires that the ARC panel make "findings of fact upon which the recommendation is based." Md. Rule 19-208(b)(4).

In the context of Attorney Grievance proceedings, this Court applies a clearly erroneous standard of review to a hearing judge's findings of fact, "giv[ing] due regard to the opportunity of the hearing judge to assess the credibility of the witnesses." Md. Rule 19-740(b)(2)(B). In other contexts, where the issue presented to the agency or board is a mixed question of law and fact, we determine whether: (1) the board has correctly stated the law, and (2) its fact-finding is supported by the record, applying the substantial evidence test—the same standard of review that we would apply to agency fact finding. *Charles County Dept. of Social Services v. Vann*, 382 Md. 286, 296 (2004). Here, it is notable that the Rule requires that the composition of the ARC include three non-attorney member psychologists or physicians and further requires that each panel proceeding includes one of the physicians or psychologists as part of the panel. *See* Md. Rule 19-208(b)(3). Presumably, this Court's requirement that the panel include one of the medical professional members is to ensure that the findings of fact are made with input from the panel's medical-professional member in the application of that member's professional judgment and expertise. In my view, it is unusual for this Court to apply a de novo review

23

to the ARC panel's findings of fact and recommendation with respect to an applicant's request for an ADA accommodation under these circumstances. Indeed, I can think of no other proceeding in which this Court undertakes a de novo review of an agency or board's findings of fact or a mixed question of law and fact requiring some degree of professional expertise.

Finally, I observe that the Majority's de novo standard of review is inconsistent with the more deferential standard of review that other state supreme courts apply in the context of judicial review of ADA testing accommodations by their boards of law examiners. *See In Re O.M.*, ___ A.3d____ (Vt. 2023), 2023 WL 2344296 (the Supreme Court of Vermont concluding that the Board of Law Examiners acted within its discretion in denying the applicant's accommodations request for an ADHD accommodation on the bar examination); *In Re Reasonable Testing Accommodations of LaFluer*, 722 N.W.2d 559 (S.D. 2006) (the Supreme Court of South Dakota upholding its board of law examiner's decision relating to a testing accommodation request, stating that, in matters related to testing matters for an examination that the Board administers, the Court "should give 'due weight' to the Board's administrative decisions and will not substitute our own notion of exam policy[]").

For these reasons, I would apply a deferential standard of review here, such as the "clearly erroneous" standard of review to the ARC panel's findings of fact and the "substantial evidence" standard of review to the ARC panel's recommendations. That said, even under a de novo standard of review, I would overrule Mr. Chavis's exceptions under the facts of this case and uphold the ARC's decision.

24

## B.     The Majority's Test

As the Majority notes, this Court has delegated authority to SBLE to adopt rules to carry out the requirements of Chapters 100 and 200 of Title 19, which includes requests for test accommodations under the ADA.  Md. Rule 19-102(c)(2).  In accordance with its delegated authority, SBLE has adopted rules.  Board Rule 3(a) states, in pertinent part that, "[i]n accordance with the ADA, [SBLE] shall provide test accommodations to an individual taking the bar examination . . . , to the extent that such accommodations are reasonable, consistent with the nature and purpose of the examination and necessitated by the applicant's disability."  The Majority observes that Board Rule 3(a) is consistent with similar rules and requirements in other states and is also similar to the language set forth in 28 C.F.R. § 35.130(b)(7)(i).  Maj. Slip Op. at 21–22.  The Majority does not disagree with the Board's adoption of Board Rule (3)(a)—and indeed embraces the language of the rule by incorporating it into a new test, which the Majority articulates as follows.[13]

Under the Majority's two-step test, the first step is to determine whether the applicant meets the definition of "disability" under the ADA—*i.e.*, whether the applicant

---

[13] Curiously, despite incorporating Board Rule 3(a) into its newly articulated test for ADA accommodations, the Majority devotes two pages of its opinion explaining that the ADA establishes a floor, or minimum standards for the protection of the rights of individuals and then appears to suggest that the SBLE adopted a rule that imposes a "higher burden than the ADA does when it comes to determining whether to grant an applicant's test accommodation request." Maj. Slip Op. at 24.  The Majority states, "[i]n other words, SBLE cannot, through its Board Rules, raise the requirements established by the ADA for accommodation requests to be granted."  *Id.*  While I agree with this statement, there is no evidence in this record that SBLE or the ARC has "raised the requirements" as the Majority suggests.  Indeed, as I discuss herein, the requirements imposed by SBLE for demonstrating the need for an ADA testing accommodation in connection with its administration of the

25

has "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. § 12102(1)(A). The second step is to determine whether the test accommodation requested by the applicant would be "reasonable, consistent with the nature and purpose of the examination and necessitated by the applicant's disability." Board Rule 3(a). I take no issue with the Majority's articulation of this test. Indeed, given that the test requires SBLE to consider whether an applicant has demonstrated a disability, and if it so concludes, to apply its existing Board Rule, it appears to be identical to the test that SBLE has been applying. Given that the Majority has characterized its application of the ADA and the Board rule as a new test, it is also curious to me why the Majority has not remanded this matter to SBLE for an application of the new test. *See, e.g.*, *Rochkind v. Stevenson*, 471 Md. 1, 39 (2020) (stating that "to apply this new evidentiary standard, we remand this case to the Circuit Court for Baltimore City for further proceedings"). Although I agree with the Majority's articulation of the test, I disagree with the Majority's application of the test to the facts of this case.

### C. *Application of the Majority's Test Here*

#### 1. *The Applicant's Burden to Establish a Disability Under the ADA – Three Elements*

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities[.]" 42 U.S.C. § 12102(1)(A). As the plain language indicates, and courts have recognized, there are essentially three elements that must be

UBE are the *same requirements* that are utilized in the other UBE states, as well as the NCBE's requirements for the MPRE—a component of the Maryland Bar Exam.

satisfied for an individual to meet this definition. First, the individual must have a "physical or mental impairment." *Id.* In analyzing the first element, a "physical or mental impairment" includes "[a]ny mental or psychological disorder, such as an intellectual disability . . . , organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). Second, the impairment must affect a "major life activit[y]." 42 U.S.C. § 12102(1)(A). "[M]ajor life activities" include, among other things, "learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). Third, the impairment must "substantially limit[]" the major life activity. *Id*. § 12102(1)(A). When considering the third element, to qualify as a disability, the impairment must substantially limit "the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii); *see also Black v. Nat'l Bd. of Med. Examiners*, 281 F. Supp. 3d 1247, 1252 (M.D. Fla. 2017) (stating that "[t]o qualify for accommodation under the ADA, a person must demonstrate that a disorder 'substantially' limits her in comparison to 'most people in the general population[ ]'"); *Healy v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 870 F. Supp. 2d 607, 616, 620 (S.D. Ind. 2012) (explaining the three-part test for determining whether a plaintiff is disabled under the ADA).[14]

---

[14] Although I agree with the Majority that, under the regulations, the term "substantially limits" is to be "broadly construed," and is "not meant to be a demanding standard[,]" it nonetheless requires a *comparative analysis* of "an individual['s ability] to perform a major life activity as compared to most people in the general population." 28 C.F.R. § 1630.2(j)(1)(ii). Notably, "not every impairment will constitute a disability within the meaning of this section." *Id.* Additionally, "[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment."

27

### 2. *The Majority's Conclusion*

After undertaking its de novo review of the record in this case, the Majority concludes, as a matter of law, that "Mr. Chavis has produced evidence sufficient to establish that he has a condition that meets the definition of 'disability' under the ADA and that his request for 50% additional time to take the UBE is reasonable." Maj. Slip Op. at 29. The Majority states that it gives "'considerable weight to' the circumstance that Mr. Chavis was given test accommodation by two law schools, and that the UBE and law school exams involve 'similar testing situations[.]'" *Id.* at 41 (citing 28 C.F.R. § 36.309(b)(1)(v), which applies to any private entity offering an examination related to applications, licensing, certification, or credentialing for secondary or postsecondary education professional, or trade purposes).

In support of its conclusion, the Majority notes that on the Southern University Verification Form, "Dr. Thiebaud *indicated* that Mr. Chavis met the 'full [] criteria' set

---

*Id.* § 1630.2(j)(1)(iv). And although the regulations state that "[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis[,]" the regulations state that "[n]othing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate." *Id.* § 1630.2(j)(1)(v). As I discuss *infra*, in a professional testing setting, such as administration of a bar examination, requesting documentation that enables a test administrator to make an objective determination of the nature and extent of an individual's impairment as compared to most people in the general population is reasonable and consistent with the requirements of the ADA. Indeed, the Department of Justice's guidance document contemplates that "[a]ppropriate documentation will *vary depending on the nature of the disability and the specific testing accommodation requested.*" U.S. Dep't of Justice, Civil Rights Div., *ADA Requirements: Testing Accommodations*, available at https://perma.cc/3CFT-S4F9 (hereinafter "DOJ Guidance") (emphasis added). Moreover, the DOJ Guidance specifically identifies "[a]n applicant's *history of diagnosis*" as an example of the type of documentation that a testing entity may require to determine whether an accommodation is warranted. *Id.* (emphasis added).

forth in the DSM-IV for 'ADHD[,] inattentive type'—*i.e.*, Dr. Thiebaud diagnosed Mr. Chavis with ADHD." *Id.* at 29 (emphasis added). The Majority acknowledges that Dr. Thiebaud's explanation of Mr. Chavis's symptoms of ADHD appears to be based upon Mr. Chavis's self-reported symptoms, and that Dr. Thiebaud did not provide any tests, analysis, or documentation that would reflect his analysis under the DSM-IV criteria. In other words, because Dr. Thiebaud checked a box on a form, and summarized Mr. Chavis's self-reported symptoms, the Majority concludes, as a matter of law, that Dr. Thiebaud made an ADHD diagnosis that satisfied the requirements for establishing a disability under the ADA, *and* that his request for 50% more time to take the UBE was reasonable. I disagree with the Majority's legal conclusion, and further disagree that such a determination is a legal conclusion in the first instance.

Simply put, Southern University Law Center granted Mr. Chavis a testing accommodation during his third year in law school based upon an incomplete Verification Form that did not comply with its own accommodation policy. Based upon this record, it appears that UDC Law, in turn, relied upon Southern University's accommodation policy to grant Mr. Chavis's accommodation for the semester he was enrolled there.

Under the facts presented in this case—which undisputedly reflect that Southern University Law Center did not follow its own accommodations policy in granting Mr. Chavis's accommodation—I disagree with the Majority that it is unreasonable as a matter of law for SBLE to require additional documentation to enable it to make an objective assessment of the nature and extent of Mr. Chavis's impairment. *See Cox v. Alabama State Bar*, 330 F. Supp. 2d 1265, 1268 (M.D. Al. 2004) ("Although information regarding

29

past accommodations may be probative in determining whether a current request constitutes a reasonable accommodation, such accommodations are not per se reasonable in every new testing situation."). Below is my analysis of Mr. Chavis's application under the Majority's test.

> 3. *My Analysis of the Documentation Submitted in this Case Under the Majority's Test*

In my view, ARC's finding of fact that the documents submitted by Mr. Chavis did not contain sufficient information for SBLE to make an objective determination that: (1) Mr. Chavis has a "disability" as defined by the ADA; and (2) the test accommodation requested by Mr. Chavis would be "reasonable, consistent with the nature and purpose of the examination and necessitated by the applicant's disability," was reasonable and not clearly erroneous.

*First*, as noted above, the ADA requires that an applicant not only prove an "impairment," that affects a "major life activity[,]"—the applicant must also prove that the impairment substantially limits their ability "to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). In other words, the Equal Employment Opportunity Commission ("EEOC") regulations contemplate that, when considering the nature and extent of a disability, the evaluator must undertake an objective, comparative analysis of the *applicant's impairment* against "most people in the general population." *Id.*; *see also, e.g.*, *Black*, 281 F. Supp. 3d at 1253 (holding that "no reasonable finder of fact could conclude that ADHD substantially limits [the applicant] in comparison to most people in the general population[ ]"). In concluding that, as a matter

of law, Mr. Chavis suffers a disability under the ADA on the basis of ADHD, the Majority omits any discussion of this part of the "substantially limits" analysis that is embodied in the EEOC regulation. *See* 29 C.F.R. § 1630.2(j)(1)(ii).

Even if one takes the position that Dr. Thiebaud made an ADHD diagnosis—the assumption made by Dr. Lewandowski in his report and his testimony before the ARC—the incomplete Verification Form provides no evaluation data or documentation that would enable a test administrator or its professional consultant to make an objective assessment of Mr. Chavis's impairment against "most people in the general population." As discussed in detail above, the Southern University Verification Form drafted by Dr. Thiebaud, on its face, is incomplete and fails to comply with the printed instructions contained therein. While the Verification Form states that a "*thorough diagnostic summary based on a comprehensive evaluation process is a necessary component of this application*[]," and describes in detail the information that was required to be included in the summary, Dr. Thiebaud did not discuss the DSM criteria, nor did he provide any description of the extent to which Mr. Chavis satisfied the criteria. Dr. Thiebaud further indicated that "formal cognitive and/or psychological testing had been administered to" Mr. Chavis; however, he failed to attach any copy of the report as the Verification Form required. No documentation was attached to support Dr. Thiebaud's handwritten notation indicating that there had been "neuropsychiatric testing." Accordingly, in its denial letter to Mr. Chavis, SBLE correctly noted the "absence of objective data to provide the ADHD diagnosis and establish impairment in a major life activity as compared to most people."

31

*Second*, the Verification Form does not provide *any* objective data that would enable a test administrator to determine whether Mr. Chavis's *specific request for 50% additional time* is "reasonable, consistent with the nature and purpose of the examination and necessitated by the applicant's disability"—the second part of the Majority's test. In response to the question on the Verification Form, directing the applicant's medical professional to set forth the "*specific testing accommodation(s)*" that the professional would recommend, "*including a detailed explanation of why the accommodation(s) is needed and how it will reduce the impact of functional limitation(s),*" Dr. Thiebaud simply wrote: "He has diagnosed ADHD and will be adversely affected if not given additional time. Please give additional time to complete exams and isolated testing environment to limit distractions, if possible." There is no objective evidence, data, or documentation upon which a test administrator could rely to establish that Mr. Chavis should receive 50% additional time. Based upon the lack of information contained in Dr. Thiebaud's incomplete Verification Form, in my view, the ARC did not err in concluding that "[t]he record does not show the required nexus between the alleged disability and the reasonable accommodations he may or may not have received."

Although the Majority seemingly embraces Board Rule 3(a) as part two of its new test (and in fact, observes that several states contain substantively identical language, and that similar language is set forth in 28 C.F.R. § 35.130(b)(7)(i), *see* Maj. Slip Op. at 21–22), the Majority does not actually apply it. Instead, the Majority states that "[a]lthough the ADA requires proof that the applicant has a disability and that the requested test accommodation would be reasonable, there is no express obligation under the ADA for an applicant to prove

32

that the requested test accommodation would also be 'consistent with the nature and purpose of the examination and necessitated by the applicant's disability.'" Maj. Slip Op. at 24 (quoting Bd. Rule 3(a)). The Majority concludes that the requirement contained in Board Rule 3(a) is "intertwined with a question of reasonableness[,]" and that "where a person establishes that the person has a physical or mental impairment that substantially limits one or more major life activities of the individual, such as 'learning, reading, concentrating, thinking, communicating and working[,]' 42 U.S.C. § 12102(2)(A), *this would, in most instances, automatically demonstrate that the person has an impairment that implicates the necessity for a test accommodation on the bar examination.*" *Id.* at 24–25 (emphasis added).

In other words, under the Majority's application of its new test, the Majority determines whether an individual is "disabled" under the ADA without any analysis of the "substantially limits" component of the definition. Once the applicant satisfies the Majority's partial application of the ADA's definition of "disability," the Majority seemingly concludes, as a matter of law, that such proof, "in most instances" satisfies the necessity for an accommodation, and concludes here that, as a matter of law, 50% additional time is reasonable. A review of the Majority's application of its test reveals that it does not apply Board Rule 3(a) at all and appears to suggest that if the applicant presents any document stating that he is "impaired," and that the impairment affects a "major life activity,"—but without any analysis of the "substantially limits" element—a presumption attaches that the applicant's specific request for a testing accommodation is "reasonable" and is therefore "necessary." I disagree with the Majority's application of this test, and as I explain *infra*, it is inconsistent with the manner in which other UBE states consider

33

requests for ADHD testing accommodations, which, in my view, could have significant administrative consequences.

For these reasons, I would conclude that the ARC's findings—that "there was no showing by Petitioner of any diagnostic or any data-based evidence related to Petitioner's assertion of ADHD[,]" and "no objective evidence or testimony was presented by the Petitioner related to a showing of substantial limitation in any major life activity, nor how there were limitations regarding functions required on the Maryland Bar Exam[,]"—were reasonable and were not clearly erroneous.

### D.     *Additional Concerns with the Majority's Opinion*

The Majority criticizes SBLE and its expert, Dr. Lewandowski, for requiring that the applicant prove an "evidence-based diagnosis" of ADHD in order to prove that the applicant has a disability. *Id.* at 34. According to the Majority, because the federal regulations regarding definitions under the ADA are "silent as to diagnoses," "[b]y concluding that a diagnosis supported by test results is necessary for a test accommodation to be granted, the ARC, SBLE, and Dr. Lewandowski used a criterion that exceeded the definition of the word 'disability' under the ADA and, in doing so, applied a higher standard in evaluating Mr. Chavis's request than what is required under the ADA." *Id.* at 34–35. The Majority claims that "routinely requiring that an applicant for admission to the bar submit specific test results in support of a physician's diagnosis when requesting a test accommodation could be inconsistent with 28 C.F.R. § 36.309(a) and (b)(iv), which provide that '[a]ny private entity that offers examinations or courses related to applications[ or] licensing' 'must assure that .

34

. . [a]ny request for documentation, if such documentation is required, is reasonable and limited to the need for the . . . accommodation . . . requested.'" *Id.* at 35–36.

First, I do not consider either SBLE's or the ARC's position to be that a "specific test result" is required. Rather, I consider SBLE's position to be the same that it expressed to Mr. Chavis in denying his request—SBLE is seeking some type of "objective data" that would support a disability arising from a clinical ADHD diagnosis that is sufficient "to establish impairment in a major life activity as compared to most people."

Second, I disagree with the Majority's conclusion that because the ADA does not use the word "diagnosis," it is unreasonable as a matter of law for a testing administrator to require that the applicant submit documentation to support a clinical diagnosis of ADHD.[15] In making a determination whether an applicant has satisfied his or her burden

---

[15] The Majority cites *Hrdlicka v. General Motors, LLC*, 63 F.4th 555, 568 (6th Cir. 2023) to support its position that Mr. Chavis did not need an ADHD diagnosis to receive an ADA accommodation on the Maryland Bar Exam. Maj. Slip Op. at 34. The Sixth Circuit's statement, in full, was that "[a]lthough a diagnosis is not necessary for an ADA claim to succeed, *see Neely v. Benchmark Fam. Servs.*, 640 F. App'x 429, 435 (6th Cir. 2016), [the plaintiff] failed to present any of the '[r]elevant information' that this court has found pertinent to determining if an employer was placed on notice of a disability." *Hrdlicka*, 63 F.4th at 568. As that language suggests, *Hrdlicka* involved, among other things, an employment discrimination claim under the ADA where the plaintiff alleged that she was wrongfully terminated after she placed her employer on notice of her persistent depressive disorder caused by a brain tumor. *Id.* at 565–66.

Even courts that have made general statements that a diagnosis is not required to establish disability under the ADA have nonetheless examined the record for such evidence. In *Neely v. Benchmark Fam. Servs.*, the Sixth Circuit stated that although it agreed with the district court that "a diagnosis *might not be absolutely necessary*" to establish a record of impairment, it nonetheless stated that "*in this situation*, some *diagnosis must explain the duration or severity of the impairment*." 640 F. App'x 429, 435 (6th Cir. 2016) (emphasis added). The Court held that the plaintiff's "self-described

35

of establishing a disability that entitles the applicant to a specific testing accommodation, it is certainly reasonable for the test administrator to request a diagnostic evaluation or other documentation necessary for the administrator to make an objective assessment that: (1) the applicant has a disability as defined by the ADA, and (2) the specific accommodation requested—such as a request for 50% additional testing time—is reasonable, consistent with the nature and purpose of the examination, and necessitated by the applicant's disability. In other words, requesting documentation to verify that an ADHD diagnosis was, in fact, made in accordance with the professional standards that govern such a diagnosis, *is*, in my view, reasonable and limited to the need for the accommodation requested as required by 28 C.F.R. § 36.309(a) and (b)(iv). Indeed, the Department of Justice's guidance document contemplates that "[a]ppropriate documentation will *vary depending on the nature of the disability and the specific testing accommodation requested*." U.S. Dep't of Justice, Civil Rights Div., ADA Requirements*: Testing Accommodations*, *available at* https://perma.cc/3CFT-S4F9 (hereinafter "DOJ Guidance") (emphasis added). Moreover, the DOJ Guidance specifically identifies "[a]n applicant's *history of diagnosis*" as an example of the type of documentation that a testing entity may require to determine whether an accommodation is warranted. *Id.* (emphasis added).

---

symptoms to his physicians, *without corroborating medical evidence or any diagnosis are insufficient* to establish a substantial limitation on a major life activity[,]" and the plaintiff therefore failed to show that he "qualified as disabled under the first prong of the ADA's definition." *Id.* (emphasis added).

Third, the type of documentation that SBLE requires an applicant to submit in order to consider an ADHD accommodation in Maryland is the *same type of documentation* that is required by the NCBE, as well as other states that administer the UBE. A survey of other states that administer the UBE reflects that, in those jurisdictions, an applicant seeking a testing accommodation for ADHD: (1) must establish that they have a *diagnosis* of ADHD based upon the DSM diagnostic criteria;[16] and (2) must submit supportive data, sufficient documentation, or other evidence to support the ADHD diagnosis,[17] which may not be based solely upon the applicant's self-reported symptoms.[18]

[16] *See, e.g.*, D.C. Ct. of Appeals Comm. on Admissions, *Guidelines for Medical Documentation of ADHD*, *available at* https://perma.cc/6NEE-BWWP ("D.C. Bar Accommodations Instructions") (stating that documentation "must include a specific diagnosis of ADHD (including the subtype or presentation) based on the DSM diagnostic criteria"); PA. Bd. of L. Exam'rs, *Instructions for Qualified Professionals and Applicants Regarding Providing Documentation*, *available at* https://perma.cc/K2L7-WHYV ("PA Bar Accommodations Instructions") (stating that documentation "must include a specific subtype diagnosis of AD/HD based on the DSM diagnostic criteria"); N.Y. State Bd. of L. Exam'rs, *Test Accommodations Handbook*, *available at* https://perma.cc/T22F-MJYF ("N.Y. Bar Accommodations Instructions") (stating that "[t]he report must include a specific diagnosis of ADHD based on professional guidelines and criteria (e.g. DSM)[ ]"); State of N.J. Bd. of Bar Exam'rs, *Non-standard Testing Accommodations (NTA) Certificate of Medical or Psychological Authority*, *available at* https://perma.cc/T2DM-FKW7 ("N.J. Bar Accommodations Instructions") (requiring a physician to fill out a form containing a "description of the applicant's diagnosis including the specific diagnosis according to the current edition of the DSM[.]"); *see also* Nat'l Conf. of Bar Exam'rs, *ADHD Medical Documentation Guidelines*, *available at* https://perma.cc/53DK-NME9 ("NCBE ADHD Accommodation Guidelines") (stating that "[t]he report must include a specific diagnosis of ADHD (including the subtype or presentation) based on the DSM diagnostic criteria (DSM-IV-TR or DSM-5)[ ]").

[17] *See, e.g.*, D.C. Bar Accommodations Instructions (stating that "[t]he qualified professional should provide . . . supportive data to substantiate the diagnosis" and "[a] detailed explanation supporting the need for each requested accommodation must be provided and correlated with specific functional limitations established through the

My view that a testing administrator may require objective data or evidence of a diagnosis to determine the nature of the disability and the reasonableness of the specific testing accommodation under the ADA is also consistent with the decisions from other

evaluation process from test results and clinical observations"); PA Bar Accommodations Instructions (stating that the documentation "should build a case for and provide sufficient evidence for the AD/HD diagnosis" and "[s]pecific test results should be reported to support the diagnosis"); N.Y. Bar Accommodation Instructions (stating that "[t]he report must include a review and discussion of the diagnostic criteria for ADHD both currently and retrospectively and specify which symptoms are present and the extent to which the patient currently meets those criteria[]" and "[t]he report must include specific data-based recommendations for accommodations" and "[t]he evaluator should support recommendations with specific test results and clinical observations[ ]"); N.J. Bar Accommodation Instructions (requiring a physician to fill out a form containing a "concise description of the applicant's diagnosis including the specific diagnosis according to the current edition of the DSM . . . and a diagnostic formulation that relates the applicant's history and current symptoms, and clinical or empirical findings to the published diagnostic criteria[]" and instructs the physician to "[l]ist [and attach] the tests, studies and/or procedures used to diagnose the physical or mental impairment[ ]"); *see also* NCBE ADHD Accommodation Guidelines (stating that "[t]he qualified professional should provide . . . supportive data to substantiate the diagnosis" and "[i]t is not sufficient for a current evaluation to simply refer to a prior diagnosis as confirmatory evidence of ADHD. The current assessment needs to reconfirm the diagnosis with supportive clinical data[]" and there should be "[a] rationale for each recommended accommodation that is correlated with specific functional limitations established through the evaluation process from test results and clinical observations").

[18] *See, e.g.*, N.Y. Bar Accommodation Instructions (stating "[i]nformation collected by the qualified professional must consist of more than self-report. Information from third party sources is critical in the diagnosis of adult ADHD"); PA Bar Accommodation Instructions (stating that "[s]elf-report is generally insufficient to substantiate [] an onset of symptoms/impairment[]" and "[s]elf-report alone, without any accompanying historical documents that validate developmentally deviant AD/HD symptoms and impairment is not sufficient to substantiate an AD/HD diagnosis"); D.C. Bar Accommodation Instructions (stating "[i]n addition to the applicant's self-report, the information should include objective historical and current evidence from third-party sources"); NCBE ADHD Accommodation Guidelines (stating that "[i]n addition to the applicant's self-report, the documentation should ordinarily include objective historical and current evidence from third-party sources").

jurisdictions.  For example, in *D'Amico*—the case relied on by the Majority in articulating its new test—the court explained that "[a]n individual analysis must be made with every request for accommodations and the determination of reasonableness must be made on a case by case basis."  *D'Amico v. N.Y. State Bd. of L. Examiners*, 813 F. Supp. 217, 221 (W.D.N.Y. 1993); *see also Rumbin v. Ass'n of Am. Med. Colleges,* 803 F. Supp. 2d 83, 94 (D. Conn. 2011) (finding that the applicant was not entitled to test accommodations under the ADA because "there are *no reliable data before the Court* from which [the applicant's] ability to read *compared to the general population* can be determined") (emphasis added).

In *In re O.M.*, ___ A.3d ___ (Vt. 2023), 2023 WL 2344296, *4, the Supreme Court of Vermont held that its Board of Bar Examiners did not abuse its discretion in denying the applicant's request for a test accommodation.  The Vermont testing accommodation form required the applicant to submit, among other things, "'documentation from one or more qualified professionals that provides information on the *diagnosed* impairment(s), the applicant's current level of impairment, and the rationale for the accommodations requested on the bar examination,'" as well as "'verifying documentation of his or her history of accommodations, if any.'"  *Id.* at *1 (emphasis added).  The Board's instructions required that various forms be included in support of the testing accommodation, including "a comprehensive evaluation report from the qualified professional who conducted an individualized assessment of the applicant," and if the applicant was requesting extra time, the professional was required to explain "why extra testing time is necessary and describe how [they] arrived at the specific amount of extra time recommended."  *Id.* at *2.

The applicant used the Board's form to explain why he had not completed other forms in support of his request, including the form containing the comprehensive evaluation report that was required to be completed by the professional. *Id.* The applicant noted that his requested accommodation (time-and-a-half) was provided to him in high school, law school, and for purposes of taking the LSAT. *Id.* Among other documentation, the applicant submitted a letter from a mental health professional stating that the applicant had been diagnosed with ADHD and an anxiety disorder in 2011. *Id.* The applicant asserted that it would be unduly burdensome for him to hire someone for the purpose of filling out the Board's comprehensive evaluation report form, and he asked that the Board approve his requested accommodation based upon the uniform accommodations he received in high school, law school, and on the LSAT. *Id.*

After the Board denied the applicant's request, the applicant appealed the denial to the Supreme Court of Vermont, which concluded that the Board "acted within its discretion in denying his accommodations request." *Id.* at *4. In upholding the Board's denial, the Court determined that the Board's requirement that the applicant provide a comprehensive evaluation form from a qualified professional in support of the accommodation request— which directly ties the requested accommodation, including the precise amount of extra time requested to, the applicant's disability—is consistent with the Department of Justice's guidance document. *Id.* (citing 28 C.F.R. § 36.309(b); DOJ Guidance). The Court concluded that the applicant had failed to provide a comprehensive evaluation report— "critical documentation showing that a qualified professional had engaged in 'an

40

individualized assessment . . . that supports the need for the requested testing accommodations.'" *Id.* at *4 (citing DOJ Guidance). The Court stated:

> While [the] applicant contends that he did provide the necessary information for the Board to grant his request, the Board acted within its discretion in concluding otherwise. We reject the suggestion that obtaining the information on the [comprehensive evaluation form] placed an undue burden on applicant. Without this key information, the Board could not properly evaluate applicant's request. Applicant bore the burden of establishing his current need for an accommodation and has failed to meet that burden here.

*Id.* The Court also concluded that the Board "was not obligated to grant [the applicant's] request [for additional time on the bar exam] based solely on the accommodations that applicant was receiving in law school and had received previously[.]" *Id.* at *5.

In *A.F. v. Association of American Medical Colleges*, ___ F. Supp. 3d ____ (S.D. Ohio 2023), 2023 WL 4072128, *12, *14, the United States District Court for the Southern District of Ohio denied a medical school applicant's request for a preliminary injunction against the organization that administers the Medical College Admission Test ("MCAT"), after the test administrator denied the applicant's request for 50% extra testing time, but instead approved 25% additional testing time. *Id.* at *2. The basis of the denial for the requested testing accommodation was that, although the applicant's medical records provided documentation to establish an ADHD diagnosis, the test administrator determined that there was "*not sufficient evidence, or data (based on objective assessment)*, to support the need for more time to access and/or process the actual test content as would be consistent with the accommodation of extended testing time." *Id.* at *3 (emphasis added). After the applicant submitted a supplemental report from her physician, the test administrator submitted the additional materials to two external professionals for their

41

review. *Id.* at *4. Both outside professionals, who had expertise in the applicant's claimed impairments, concluded that her documentation fell short of supporting her request for 50% extra time on the MCAT. *Id.* In light of the additional documentation, however, the test administrator granted the applicant 25% extra time. *Id.* at *5.

The court reviewed the applicant's physician's reports, as well as the findings by the testing administrator's outside professionals and determined that there was "little evidence in the record indicating that" the test administrator's alternative accommodations were unreasonable for the applicant's disability. *Id.* at *12. The court noted that one of the applicant's physician's reports "*provide[d] little more than a conclusory statement when recommending 50% extra testing time rather than 25% extra time[,]*" and that the applicant's other physician "*only conclude[d] that*" the applicant *needed* "*an unspecified 'extra time' accommodation*—not an accommodation for 50% extra testing time." *Id.* (emphasis added). Accordingly, the court found that the applicant had failed to meet her burden of establishing a strong likelihood of success on the merits. *Id.*

In *Healy v. National Board of Osteopathic Medical Examiners*, 870 F. Supp. 2d 607, 622 (S.D. Ind. 2012), the court found no violation of the ADA after a medical student brought an action against the medical board arising from its denial of his request for a testing accommodation. In upholding the testing administrator's denial of a testing accommodation based upon an ADHD diagnosis, the court concluded that it was "unable to find that" the applicant "suffer[ed] from ADHD cognizable under the ADA." *Id.* at 618. In so concluding, the court agreed with the determination of the testing administrator's consulting physician that the diagnosis presented by the applicant's physician was

42

"undermine[d]" by the "underlying dearth of data supporting" the diagnosis. *Id.* at 619.

The court quoted the conclusions expressed by the testing administrator's consulting

physician:

> [The applicant's physician] indicated his ADHD diagnosis was based on [the applicant's] personal recall and his mother's report. This is not sufficient. We don't know what assessment measures [the physician] used, which or how many of the DSM-IV symptoms of ADHD he endorsed . . . , what the nature or magnitude of any impairment he experienced was, and [the physician] simply did not build an adequate case to justify the diagnostic conclusion of ADHD.

*Id.* The court further noted that the applicant's physician admitted that he based his

diagnosis on only the applicant's and his mother's reports and concluded that it was

"insufficient to justify formal recognition of a clinical diagnosis." *Id.*

Finally, I disagree with the Majority's cautionary advice contained in footnote 21

for two reasons. In footnote 21, the Majority states that:

> SBLE might wish to consider revising page 4 of its Test Accommodation Request Form, given that the page states that, for SBLE to grant a test accommodation request, the disability must have been diagnosed, and, if the diagnosis is of ADHD, the diagnosis cannot properly be based solely on information that the applicant self-reported as to "developmental history, current symptoms, and evidence of clinically significant impairment."

Maj. Slip Op. at 37 n.21.

First, in my view, this Court should exercise caution and restraint when giving

advisory suggestions as to the types of documentation or evidence that SBLE should or

should not request in connection with ADHD testing accommodations. There is no legal

basis for this Court to hold, as a matter of law, that applicants applying to take the UBE in

this jurisdiction are not required to submit some type of documentation that would enable

43

an objective analysis by the test administrator to determine whether the applicant has received an ADHD diagnosis that comports with the DSM guidelines that are required to be considered in making such a diagnosis. Moreover, as I note in footnotes 16 through 18 *supra¸* the instruction forms in other UBE jurisdictions reflect that these jurisdictions *require similar documentation* and *include similar instructions* on their ADA testing forms. The NCBE contains similar language in its instructions to applicants when seeking an ADA accommodation for the MPRE—a test that an applicant is required to successfully pass in order to gain entry to the Maryland Bar. Language in an opinion of this Court that could be interpreted as establishing a relaxed standard of proof in Maryland for ADA accommodations in connection with the administration of the UBE—a test that is portable and can be taken in any UBE jurisdiction—could have significant administrative consequences.

Second, the Majority's relaxed standard for proving whether an applicant is "disabled" and whether requested accommodations are reasonable creates fairness concerns. *See Rothberg v. L. Sch. Admission Council*, 102 F. App'x 122, 127 (10th Cir. 2004) (McConnell, J., concurring) (noting the importance of the reasonableness inquiry in test accommodation cases because giving applicants unneeded extra time would give them "an unjustified advantage on a test for which every student would benefit from extra time[ ]"); *D'Amico*, 813 F. Supp. at 221 (noting that "[t]here is a delicate balance that must be made in determining the reasonableness of a given request [for accommodations] especially when it relates to examinations and testing procedures. The purpose of the ADA is to guarantee that those with disabilities are not disadvantaged . . . [not] to give [] disabled

44

[applicants] advantages over other applicants[ ]"); *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011) (stating that "the public [] has an interest in ensuring the integrity of licensing exams"). Providing additional time on the Maryland Bar Exam to applicants who do not need it due to a disability would give them "an unjustified advantage on a test for which every student would benefit from extra time." *Rothberg*, 102 F. App'x at 127 (McConnell, J., concurring).

Finally, I make a few additional observations concerning this case.

*First*, based upon this record, it is clear that Mr. Chavis made a sincere, genuine, and honest effort to apply for a test accommodation in this case. There is no evidence in the record that would reflect that Mr. Chavis did not earnestly seek assistance from medical professionals to obtain an ADHD accommodation. Mr. Chavis may in fact have ADHD, but there is insufficient evidence in this record to determine that he does.

*Second*, I agree with the Majority that evidence of a childhood diagnosis is not required to receive an ADA accommodation and should not be held against Mr. Chavis. As indicated in this dissent, an ADHD diagnosis frequently occurs in adults. I do not base any part of my dissent on this ground.

*Third*, I agree with the Majority that test accommodations given in law schools are certainly relevant to a test accommodation for the UBE and that SBLE should give prior accommodations considerable weight in accordance with the Department of Justice's regulations and guidance document. And a review of this record reflects that SBLE does, in fact, give such weight to prior test accommodations. However, it was not unreasonable for SBLE and the ARC panel to review the Verification Form submitted by Dr. Thiebaud

45

and determine, on its face, that it was incomplete and did not satisfy the accommodation requirements established by the University.

*Fourth*, this Court has not been presented with any evidence that would raise concerns about the manner in which SBLE's expert, Dr. Lewandowski, performed his objective analysis of the evidence in this case pursuant to professional standards in his field of expertise. Although it is certainly acceptable for SBLE to consider using additional experts, that is a decision completely within SBLE's purview.

*Fifth*, based upon my review of this record, I would hold that it was not unreasonable or clearly erroneous for the ARC panel to determine on this record, that there was "no objective evidence or testimony presented by [Mr. Chavis]" to establish that he has been diagnosed with ADHD. Additionally, there is "no objective evidence or testimony" presented by Mr. Chavis "related to a showing of substantial limitation in any major life activity, nor how there were limitations regarding functions required on the Maryland Bar Exam."

*Sixth*, in overruling Mr. Chavis's exceptions on this record, I would remand this matter to SBLE, with instructions for SBLE to "provide [Mr. Chavis] an opportunity to correct any deficiencies in the accommodation request before the filing deadline" for the next administration of the Bar Examination as permitted under Maryland Rule 19-206(b).

For these reasons, I respectfully dissent.

Chief Justice Fader and Justice Gould have authorized me to state that they join this opinion.